UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | Case No. 23-10808-JGR |
| | ) | |
| NORTH SHORE ASSOCIATES, LLP | ) | |
| EIN:84-07066736 | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |
| In re: | ) | |
| | ) | Case No. 23-10809 JGR |
| NORTH SHORE MANOR, INC., | ) | |
| EIN: 84-0660666 | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |

## NOTICE OF FILING OF AMENDED DEBTOR IN POSSESSION LOAN DOCUMENTS

PLEASE TAKE NOTICE, in accordance with the statements on the record at the hearing May 19, 2023, the Debtors hereby file the Amended Lending and Security Agreement and corresponding Promissory Note (the "DIP Loan Documents"), which are attached hereto as Exhibit 1. The DIP Loan Documents were provided to counsel for Columbine parties and all comments provided by the Columbine parties were incorporated into the DIP Loan Documents. The SubV Trustee in the Northshore Manor case has also reviewed and approved the documents.

DATED:  May 24, 2023            Respectfully Submitted,

By:_____ *s/ Keri L. Riley*_____
Keri L. Riley, #47605
**KUTNER BRINEN DICKEY RILEY, P.C.**
1660 Lincoln Street, Suite 1720
Denver, CO 80264
Telephone:  (303) 832-2400
Telephone: (303) 832-2910
Email: klr@kutnerlaw.com
*Counsel for North Shore Associates*

AND

*By: Aaron A. Garber* _____
Aaron A. Garber #36099
WADSWORTH GARBER WARNER CONRARDY, P.C.
2580 West Main Street, Suite 200
Littleton, Colorado 80120
Telephone: (303) 296-1999
Telecopy: (303) 296-7600
Email: agarber@wgwc-law.com
*Counsel for North Shore Manor*

# EXHIBIT 1

## CERTIFICATE OF SERVICE

The undersigned certifies that on May 24, 2023, I served by ECF a copy of the foregoing **NOTICE OF FILING OF AMENDED DEBTOR IN POSSESSION LOAN DOCUMENTS** on all parties against whom relief is sought and those otherwise entitled to service pursuant to FED.R.BANKR.P. and these L.B.R. at the following addresses:

Robert Samuel Boughner     Samuel.Boughner@usdoj.gov
Zachary Fairlie     zfairlie@spencerfane.com, lwhitaker@spencerfane.com
Joli A. Lofstedt     joli@jaltrustee.com, ecf.alert+Lofstedt@titlexi.com,brenda@jaltrustee.com
John A. O'Brien     jobrien@spencerfane.com,
anissly@spencerfane.com;zbalog@spencerfane.com
Keri L. Riley     klr@kutnerlaw.com, vlm@kutnerlaw.com
Scott C. Sandberg     ssandberg@spencerfane.com,
anissly@spencerfane.com;lwhitaker@spencerfane.com
US Trustee     USTPRegion19.DV.ECF@usdoj.gov


By:   */s/Nichole Garber*
            For Wadsworth Garber Warner Conrardy, PC

## LENDING AND SECURITY AGREEMENT

This Revolving Line of Credit and Security Agreement ("Lending Agreement") is entered into as of May 24, 2023 by and between North Shore Associates, LLP, Debtor-in-Possession in the United States Bankruptcy Court for the District of Colorado, administered under Case No. 23-10808-JGR ("NSA") and North Shore Manor, Inc., Debtor-in-Possession in the United States Bankruptcy Court for the District of Colorado, administered under Case No. 23-10809-JGR ("NSM" and together "Borrower" or "Borrowers") and Loveland Health, LLC ("Lender").

### RECITALS

1.      NSA filed a Voluntary Petition for protection under Chapter 11 of the Bankruptcy Code on March 6, 2023, Case No. 23-10808-JGR ("NSA Chapter 11 Case"). As of the date of this Lending Agreement, NSA is a Debtor-in-Possession.

2.      NSM filed a Voluntary Petition for protection under Chapter 11 of the Bankruptcy Code on March 6, 2023, Case No. 23-10809-JGR ("NSM Chapter 11 Case"). As of the date of this Lending Agreement, NSM is a Debtor-in-Possession.

3.      NSM is a skilled nursing facility operating out of the property owned by NSA. This post-petition financing as proposed is to ensure that NSM has sufficient funds with which to continue to operate the business, pay for the cost to transition to a new management company, and confirm a Plan of Reorganization, without the benefit of which, the value of NSA's real property will be impaired.

4.      The Borrowers have requested that the Lender make available to the Borrowers a credit facility in the aggregate principal amount of up to $700,000 ("Facility"). The Facility is subject to approval by the Court in the NSA and NSM Chapter 11 Cases.

5.      The Facility shall be advanced in two parts and for two purposes: (a) to payoff the loan of First National Bank of Omaha, purportedly assigned to Wapello Holdings II, LLC ("WHII") who filed a Proof of Claim in amount of $393,547.44[1] (the "FNBO Advance") and (b) the balance in the form of a line of credit utilizing a revolving line of credit (the "LOC").

6.      In order to secure the repayment of funds advanced to NSM under the LOC, NSM will generally provide the Lender with an allowed administrative expense claim in the NSM's Chapter 11 case pursuant to Section 364(b) of the Bankruptcy Code having priority over all unsecured debt as an administrative expense, subject to the proviso that the Lender may not seek disgorgement of any administrative expenses payments made with the LOC.

---

1 As of May 19, 2023, the WHII indebtedness was $432,683.07, inclusive of principal, interest and attorney fees. Interest is accruing at a the per diem rate of 101.03.

7.    In order to secure the repayment of funds actually advanced to NSA under the LOC, NSA will generally provide the Lender with an allowed administrative expense claim in the NSA's Chapter 11 case pursuant to Section 364(b) of the Bankruptcy Code having priority over all unsecured debt as an administrative expense, subject to the proviso that the Lender may not seek disgorgement of any administrative expenses payments made with the LOC.

8.    In Order to secure repayment of the FNBO Advance and advances made to NSM under the LOC, NSM hereby grants Lender the following assets of the NSM:

The following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located,

A.  All inventory, equipment, accounts (including but not limited to all health-care-insurance receivables), chattel paper, instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles); all oil, gas and other minerals before extraction; all oil, gas, other minerals and accounts constituting as-extracted collateral; all fixtures; all timber to be cut; all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property, and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; all good will relating to the foregoing property; all records and data and embedded software relating to the foregoing property and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property. The "Collateral."

B.  All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later

C.  All products and produce of any of the property described in the Collateral section.

D.  All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in the Collateral section.

2

E. All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in the Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

F. All records and data relating to any of the property described in the Collateral section whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

## AGREEMENT

NOW THEREFORE, the Parties agree as follows:

1. **Acknowledgment of Recitals**. The Recitals set forth above are true and correct and are incorporated herein by this reference as a substantive part of this Lending Agreement.

2. **Definitions**. The following terms as used herein have the following meanings:

"**Agreement**" means this Lending Agreement as it may be amended, modified or supplemented from time to time.

"**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978 as amended and codified at 11 U.S.C. §101, *et seq.*

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Colorado or any other court having jurisdiction over the Borrower's Chapter 11 case.

"**Borrowers**" has the meaning set forth in the heading of this Lending Agreement.

"**Default**" means any condition or event which with the giving of notice or lapse of time or both would, unless cured or waived, become an Event of Default.

"**Event of Default**" has the meaning set forth in paragraph 17.

"**Facility**" has the meaning set forth in Recital paragraph 4.

"**Loans**" mean the advances in the form of Drawings made by the Lender to the Borrower under the Facility set forth in Recital paragraphs 4 and 5.

"**Loan Documents**" shall mean this Lending Agreement, the Note, and any ancillary document which is required or otherwise executed pursuant to this Lending Agreement.

3

"**Maturity Date**" means the earlier of: (a) the date the Note is accelerated after an Event of Default (including the appointment of a trustee or removal of a debtor as a debtor in possession); (b) the date the Borrower's Chapter 11 case is converted to a Chapter 7 case or dismissed; (c) one year from the date of this Lending Agreement; or (d) treatment under a confirmed Plan of Reorganization.

"**Note**" means a promissory note of Borrower payable to the order of any Lender, delivered pursuant to a request of Borrower in substantially the form of Exhibit A evidencing the aggregate indebtedness of Borrower to such Lender resulting from the Loans made by such Lender.

"**Parties**" means the Borrower and Lender collectively.

"**Post-Petition**" means and refers to any time on or after the petition date of the Borrowers Chapter 11 cases.

3.      **Lender Commitment**. The Lender agrees on the terms and conditions set forth in this Lending Agreement, to extend credit to the Borrowers by way of revolving credit line Loans as provided below to the Borrowers, pursuant to the Facility and in the form of Drawings that collectively shall be deemed to be a Master Promissory Note. Each extension of credit pursuant to this revolving credit line shall be in such amount as the Borrowers may request, but the aggregate principal amount shall not exceed $700,000, subject to the restrictions set forth herein. Such commitment shall become effective upon approval by the Bankruptcy Court.

a.  In General. Subject to the terms of this Agreement, the Lender hereby establishes a credit facility in favor of the Borrowers (the "Credit Facility") under which the Lender will extend credit to the Borrowers from time to time until March 5, 2024, or such later date as the parties may agree in writing to extend the Credit Facility, (the "Credit Termination Date") by way of Loans in the form of Drawings pursuant to the terms herein. Each extension of credit shall be in such amount as the Borrowers may request, but the aggregate principal amount of all extensions of credit at any one time outstanding shall not exceed $700,000 (the "Commitment"). The Borrowers may obtain credit, repay without penalty and obtain further credit as provided for under this Agreement, from the date hereof until the Credit Termination Date, in either the full amount of the Commitment or any lesser sum.

b.  Drawings. The Borrowers may draw on the Commitment in the following manner(s): By obtaining a cash advance (each such cash advance herein referred to as a "Loan").

c.  Requests for Loans or Credit. In respect of each Loan and each other extension of credit, the Borrowers shall give to the Lender at least one business day's

4

telephonic notice of the Borrower's request therefor (in each case confirmed prior to disbursement of the Loan or other extension of credit by a written "Notice of Borrowing" in the form of Exhibit B attached hereto).

4.      **Use of Loan Proceeds**.  The Drawings under the Loan shall be used as follows:

a.  The LOC shall be used by the each Borrower to fund the each Borrower's operating and administrative expenses during the continued administration of the Chapter 11 case and post Plan confirmation pursuant to budgets provided to the Lender.  Borrowers agree to provide any and all profit and loss statements, financial statements and other documents as may be reasonably requested by a Lender within fifteen (15) days after a Lender's written request for such documentation.

b.  The FNBO Advance shall be used to payoff the loan of First National Bank of Omaha, purportedly assigned to WHII who filed a Proof of Claim in amount of $393,547.44. [2]

5.      **Maturity of Loans**.  The Loans shall mature and the principal amount thereof shall be due and payable on the Maturity Date.

6.      **Interest**.  The Loans shall bear interest on the outstanding principal amount thereof, for each day from and including the date each Loans was made to the Borrowers but excluding the date on which the Loans becomes due at a rate per annum (computed on the basis of the actual days elapsed over a year of 365 days) equal to 8% per annum.  After default, the Loans shall bear interest in the same manner as set forth above at the rate of 16% per annum.  Interest on the Loans shall accrue and be due and payable upon prepayment or at the Maturity Date for the Loans, whether by acceleration or otherwise and after the Maturity Date on demand.

7.      **Prepayment**.  The Borrowers shall have the right at any time and from time to time to prepay the Facility in whole or in part.  All prepayments shall be accompanied by accrued but unpaid interest on the principal amount of the Loans being prepaid to the date of prepayment.  Once a prepayment is made, whether it is mandatory or discretionary, it may be re-advanced to the Borrower with the express written consent of Lender.

8.      **Priority Interest**.  Pursuant to Section 364(b) of the Bankruptcy Code, the Loans under the LOC shall constitute an allowed administrative expense claim in the NSM and NSA Chapter 11 cases.  Notwithstanding the priority nature of the Loans under the LOC during the Borrowers' Chapter 11 cases, the co-equal priority shall not be grounds for disgorgement of those professional fees or other administrative expenses which have been paid

---

2 As of May 19, 2023, the WHII indebtedness was $432,683.07, inclusive of principal, interest and attorney fees.  Interest is accruing at a the per diem rate of 101.03.

by the Borrower with the proceeds of the LOC pursuant to the terms of the Loan and prior to the Maturity Date for the Loan.

9. **Conditions Precedent**. The obligation of a Lender to make a Loan to the Borrowers is subject to the satisfaction of the following conditions precedent, unless waived by the Lender:

      a. The Lender shall have received the duly executed Note payable to the order of the Lender.

      b. The Lender shall have received evidence satisfactory to it that all conditions precedent to making the advance have been met.

      c. The Lender shall have received a copy of a final order from the Bankruptcy Court approving this Lending Agreement which shall have been entered by the Bankruptcy Court on such notice and with such terms as may be satisfactory to the Lender and the Borrowers and which shall have not been reversed, modified, annulled, vacated or stayed.

      d. The Lender shall have received all documents it may reasonably request.

      e. The Lender shall be satisfied, in its good faith discretion, that there has been no material adverse change in Borrowers' financial condition or the prospects for a successful reorganization.

10. **Representations and Warranties**. In order to induce the Lender to make the Loans under the Facility, the Borrowers represent and warrant, as applicable, following:

      a. The Borrowers have the requisite power and authority to affect the transactions contemplated herein and has all requisite power and authority and the legal right to own and operate its property as is contemplated under this Lending Agreement.

      b. The execution, delivery and performance by the Borrowers of each of the Agreement and Note are within the power of the Borrower, as applicable, and have been duly authorized and delivered by the Borrower and the Note will be when executed and delivered hereunder a valid, legal and binding obligation of the Borrowers enforceable against the Borrowers in accordance with its terms and will not violate any law, regulation or Court order.

11. **Environmental Law Compliance**. The Borrowers have complied, are currently in compliance, and will continue to comply in all respects with any and all environmental laws, ordinances, orders or decrees of any state, federal, municipal or other

governmental body or agency applicable to the Borrowers, including but not limited to, the State of Colorado and those of the United States.

12. **No Defenses**. The Borrowers are justly indebted to the Lender for the obligations created by this Lending Agreement and the Borrowers do not currently have and agree that they will not at any time hereafter assert any defense, offset or counterclaim with respect to the payment of its obligations under this Lending Agreement and the Note.

13. **Affirmative Covenants**.

a. The Borrowers shall provide the Lender with all interim statements and operating reports ("Reports") filed by the Borrower with the Office of the United States Trustee concurrently with the filing of the Reports, either by facsimile or personal delivery. Those reports must be filed on or before the 21st day of each calendar month during the term of the Agreement and the Borrowers agree to timely file all such reports.

b. Borrowers shall, on request, provide the Lender with an annual balance sheet, statement of income and retained earnings and statement of changes in financial position, for the past fiscal year. Such financial statement shall be provided within ninety (90) days of the end of each fiscal year of Borrowers during the term of this Lending Agreement. From time to time hereafter, Lender may discover that it requires further financial reports and information from Borrowers. Borrowers agree to fully cooperate with the Lender and provide Lender with such requested reports and information as may reasonably be requested within five business days of its receipt of the Lender's written request.

c. Borrowers shall permit the Lender to visit the business and Property at such reasonable times during normal business hours upon reasonable notice.

d. Borrowers will keep all material property useful and necessary in its business in good working order and condition, ordinary wear and tear excepted; will maintain, with a financially sound and reputable insurance company, insurance on all its property in at least such amounts and against at least such risks as are usually insured against by companies of established repute engaged in the same or similar business and will furnish to the Lender upon written request full information as to the insurance carrier.

e. The Borrowers will comply with all court orders in the Chapter 11 cases.

f. The Borrowers will pay all agreed obligations arising under this Lending Agreement after the execution of the Agreement promptly and in accordance with the terms and conditions hereof and pay and discharge promptly all taxes, assessments and governmental charges or levies imposed upon it or upon its

7

income or profits or in respect of its property before the same shall become in default as well as all material lawful claims for labor, materials and supplies which if unpaid might become a lien or a charge upon assets of the Borrower.

14. **Further Assurances**. Upon the request of the Lender, the Borrowers shall duly execute and deliver or cause to be duly executed and delivered at the cost and expense of the Borrowers such further instruments as may be necessary or proper in the reasonable judgment of the Lenders to carry out the provisions and purposes of this Lending Agreement.

15. **Events of Default**. Any one or more of the following events shall have occurred and be continuing shall constitute an Event of Default:

a. The Borrower shall fail to pay within ten (10) days of the due date the obligations created by this Lending Agreement, or the Note;

b. This Lending Agreement shall cease to be in full force and effect and valid;

c. The Order approving this Lending Agreement shall be modified, vacated, supplemented or amended in any respect on the request of any party other than the Debtor;

d. The Bankruptcy Court shall enter an Order:

i. Dismissing either Chapter 11 case;

ii. converting either Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code;

iii. appointing a Trustee in the NSA Chapter 11 case;

iv. removing NSM as a Debtor in Possession pursuant to 11 U.S.C. § 1185(a);

e. As to NSA, the Bankruptcy Court enters an Order approving a Disclosure Statement in connection with a Plan of Reorganization proposed by a third party which Plan does not provide for payment in full in cash of the Note on the Maturity Date or upon confirmation of the proposed Plan;

f. Any non-monetary judgment or order with respect to a pre- or post-petition transaction or event shall be entered against the Borrowers which does or could reasonably be expected to cause a material adverse condition determined at the sole discretion of the Lender;

8

g.  There occurs any effective or actual change in control of the Borrowers absent the prior written consent of the Lender; or

h.  The Lender deems itself insecure as a result of a material adverse change in the Borrowers' financial condition, prospects, liquidity or ability to service its financial obligations;

and in every such Event of Default and at any time thereafter during the continuance of such Event of Default without further order of or application to the Bankruptcy Court the Lender may take any or all of the following actions at the same or at different times:

i.   by notice to the Borrowers terminating the Facility;

ii.  by notice to the Borrowers declare the Note together with all interest, fees and expenses accrued thereon to be and the Note shall thereupon become immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and

iii. upon written notice to the Borrowers exercise such remedies as are provided for elsewhere in this Lending Agreement, the Note, or as may otherwise be available under applicable law.

16.  **Repayment of Loans**.

a.  Currency, Place and Dates of Payments. Payments shall be made in United States money at the Lender's address stated herein, or at such other place as the Lender shall have designated by written notice to the Borrowers. Any payment due on a day that is not a Business Day shall be made on the next succeeding Business Day and the extension of time shall be included in the computation of interest.

c.  Evidence of Making and Repayment of Loans. The Lender's records evidencing the date of disbursement and principal amount of each Loan and the amounts of all repayments of principal and payments of interest on each Loan shall constitute prima facie evidence of the making and repayment of such Loans and of the payment of such interest. However, Lender's making of erroneous notations in its records shall not affect the Borrower's obligation to repay the outstanding balance of principal under a Loan, and accrued interest thereon, as provided in this Agreement.

d.  Evidence of Indebtedness; Loan Documents. The Facility is or is to be evidenced and/or secured by this Agreement, a Promissory Note in the form attached as Exhibit A and all such other documents as the Lender may require from time to time to effectuate the intent of this Agreement, together with all renewals, extensions and modifications thereto (collectively

9

the "Loan Documents").

17.     **Borrower's Obligations**. The Borrower's obligations to pay, observe, and perform all indebtedness, liabilities, covenants and other obligations on the part of the Borrower to be paid, observed and performed under this Agreement and the remainder of the Loan Documents are herein collectively called the "Obligations".

18.     **Notice**. Delivery of any notice required herein to be given to the Borrower shall be deemed sufficient and complete if any such letter or notice is sent by messenger, Federal Express and/or emailed to the Borrower and Borrowers' attorney at the following address:

> North Shore Associates, LLP
> 201 Columbine Street, Suite 15
> PO Box 6346
> Denver, CO 80206

> with a copy to:

> Keri L. Riley, Esq.
> Kutner Brinen Dickey Riley, P.C.
> 1660 Lincoln St.
> Suite 1720
> Denver, CO 80264
> Email: klr@kutnerlaw.com
> **AND**

> North Shore Manor, Inc.
> 201 Columbine St., STE 15
> PO Box 6362
> Denver, CO 80206

> with a copy to:

> Aaron A Garber, Esq.
> Wadsworth Garber Warner Conrardy, P.C.
> 2580 West Main Street, Suite 200
> Littleton, CO 80120
> Email: agarber@wgwc.com

10

Notice to Lender shall be deemed sufficient and complete if such letter or notice is sent by Federal Express and email to:

    Loveland Health, LLC
    3462 E. 2nd Ave.
    Denver, CO 80206

19.    **Integration**.  Except as expressly provided in this Lending Agreement, this Lending Agreement is the final written expression and the complete and exclusive statement of all of the agreements, conditions, promises and covenants among the parties with respect to the subject matter hereof and supersedes all prior or contemporaneous agreements, negotiations, representations, understandings and discussions among the parties and/or their respective counsel with respect to the subject matter covered hereby.  Any amendment or modification to this Lending Agreement, in order to be legally binding, must be in writing specifically referring to the Agreement and signed by duly authorized representatives of all parties, or otherwise approved by the Bankruptcy Court.

20.    **No Benefit to Nonparties**.  Nothing contained in this Lending Agreement is intended nor shall it be construed or deemed to confer any rights, powers, or privileges on any person, firm, partnership, corporation or other entity not an express party hereto or a successor in interest thereof.  The parties reserve all of their rights under law, equity, or otherwise with respect to such non-parties and/or successors in interest.

21.    **Limitation of Relationship**.  The relationship of Borrower and any Lender shall continue to be that of borrower and creditor. Nothing contained in this Lending Agreement shall be deemed or construed to create any partnership, tenancy-in-common, joint tenancy, joint venture, co-ownership or other relationship between a Lender and Borrower.

22.    **Power of Representatives**.  Any party executing this Lending Agreement in a representative capacity is duly authorized and empowered to do so.

23.    **Counterparts**.  This Lending Agreement may be executed in any number of counterparts, each of which shall be an original. Such counterparts shall together constitute but one and the same Instrument.

24.    **Waiver**.  No failure or delay by the Lender in exercising any right, power, or privilege hereunder or under the Note shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

25.    **Expenses**.  If an Event of Default occurs the Borrowers shall pay all out-of-pocket expenses incurred by the Lender including reasonable attorney fees and disbursements

11

of Lender's counsel in connection with such Event of Default and collection and other enforcement proceedings resulting therefrom.

26.     **Successors and Assigns**.  This Lending Agreement shall be binding upon and inure to the benefit of the Lender and all further holders of the Note and their respective successors and assigns, including any Chapter 7 Trustee.  This Lending Agreement shall be binding upon the Borrowers and their successors, however, the Borrowers may not assign or transfer any of their rights or obligations under this Lending Agreement without the prior written consent of the Lender.

27.     **Choice of Law**.  This Lending Agreement and the Note shall be construed in accordance with and governed by the laws of the State of Colorado except to the extent preempted by federal law.

28.     **Effectiveness**.  This Lending Agreement shall not become effective until it has been executed by the Borrower and the Lender and a final order has been entered in the Borrowers' bankruptcy case approving this Lending Agreement.

The parties hereto have caused this Secured Lending Agreement to be duly executed as of the date first written.

<u>LENDER</u>:

**LOVELAND HEALTH, LLC**

| | | |
|---|---|---|
| **Boruch Levin** | **A. Mayer Kohn** | **David Fogel** |

Its: Board of Managers

**[remaining signatures on following pages]**

12

BORROWERS:

**NORTH SHORE MANOR, INC.**

By: _____
Its: Interim CEO

**NORTH SHORE ASSOCIATES, LLP**

JOSHUA A. LEVIN TRUST DATED
JANUARY 1, 2020 AS AMENDED FBO
JOSHUA A. LEVIN

BY: _____
Chandra Levin, Trustee

JOSHUA A. LEVIN 2018 TRUST

BY: _____
Joshua A. Levin, Trustee

_____
Menachem M. Levin

_____
Shoshanna Levin

_____
Baruch Levin

Lynne Levin

ESTHER LEVIN TRUST

BY _____
Mosh Levin, Co-Trustee

BY _____
Esther Levin, Co-Trustee

_____
Linda Fogel

_____
Mark Kohn

_____
Beth Radetsky

13

**EXHIBIT A**

PROMISSORY NOTE

Denver, Colorado                                                                    May 24, 2023

FOR VALUE RECEIVED, the undersigned, North Shore Associates, LLP, Debtor-in-Possession in the United States Bankruptcy Court for the District of Colorado, administered under Case No. 23-10808-JGR ("NSA") and North Shore Manor, Inc., Debtor-in-Possession in the United States Bankruptcy Court for the District of Colorado, administered under Case No. 23-10809-JGR ("NSM" and together "Borrowers"), hereby unconditionally promises to pay on or before the "Maturity Date", as defined in the Lending Agreement dated May 24, 2023 ("Lending Agreement"), to the order of Loveland Health, LLC, its successors and assigns ("Lender") at 3462 E. 2nd Ave, Denver, CO 80206, or such other place and manner as may be designated by Lender, in lawful money of the United States of America, immediately available funds, the outstanding principal balance of the borrowings as set forth in the last entry on the Schedule attached hereto (the "Loan Amount") and as provided for below, and the aggregate amount of fees, accrued and unpaid interest, and costs accrued thereon.

All terms not otherwise defined herein shall have those definitions as are ascribed to those terms in the Lending Agreement.

1.      The Loan Amount. NSM shall be an obligor under this Note and shall only be responsible for repaying that portion of the Loan Amount that is lent to NSM.  NSA shall be an obligor under this Note and shall only be responsible for repaying that portion of the Loan Amount that is lent to NSA.

2.      Repayment.  Interest shall accrue on the outstanding principal balance of this note but shall not be compounded.  The outstanding Loan Amount this Note, together with any accrued but unpaid interest thereon, shall be due and payable on or before the date that is one year from the date of the Lending Agreement, or as otherwise provided in the Lending Agreement (the "Maturity Date").  All payments shall be applied first to accrued interest and then to principal.

3.      Interest.  This Note shall accrue interest in like money on the outstanding Loan Amount from the date of disbursement at the rate of 8% per annum.  After default, the outstanding Loan Amount shall bear interest at the rate of 16% per annum (the "Default Rate"). Accrued interest on the outstanding Loan Amount shall be payable upon any prepayment or at the Maturity Date, whether by acceleration or otherwise and after the Maturity Date on demand.

4.      Prepayment.  The indebtedness evidenced hereby may be prepaid in whole or in part, at any time and from time to time, without penalty. Any such payments shall be credited first to any accrued and unpaid interest and then to the outstanding principal balance hereof.

5.      Security Agreement.  The indebtedness with respect to monies advanced to NSMis secured by the Collateral set forth in the security agreement provisions of the Lending Agreement.

6.      Waiver.  Borrowers waives presentment, notice of dishonor and protest.

8.      Extension.  Borrowers agree that the Maturity Date of this Note, or any payment due hereunder, may be extended at any time or from time to time by Holder without releasing, discharging, or affecting Borrower's liability.

9.      Invalidity.  Any provision of this Note that is deemed invalid or unenforceable shall be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Note.

10.     Attorneys' Fees.  In the event a suit, action, arbitration, or other proceeding of any nature whatsoever, including without limitation any proceeding under the U.S. Bankruptcy Code, is instituted, or the services of an attorney are retained, to interpret or enforce any provision of this Note or with respect to any dispute relating to this Note, the prevailing party shall be entitled to recover from the losing party its attorneys', paralegals', accountants', and other experts' fees and all other fees, costs, and expenses actually incurred and reasonably necessary in connection therewith. In the event of suit, action, arbitration, or other proceeding, the amount thereof shall be determined by the judge or arbitrator, shall include fees and expenses incurred on any appeal or review, and shall be in addition to all other amounts provided by law.

11.     Relationship of Parties.  Nothing in this Note shall create a relationship between Borrowers and Holder of partnership or of principal and agent, it being their intent that their relationship is that of debtor and creditor.

12.     Default.  Any one or more of the following events shall have occurred and be continuing shall constitute an Event of Default:

   a. The Borrower shall fail to pay within ten (10) days of the due date the obligations created by this Lending Agreement, or the Note;

   b. This Lending Agreement shall cease to be in full force and effect and valid;

   c. The Order approving this Lending Agreement shall be modified, vacated, supplemented or amended in any respect on the request of any party other than the Debtor;

   d. The Bankruptcy Court shall enter an Order:

      i. Dismissing either Chapter 11 case;

      ii. converting either Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code;

      iii. appointing a Trustee in the NSA Chapter 11 case;

      iv. removing NSM as a Debtor in Possession pursuant to 11 U.S.C. § 1185(a);

2

    e.   As to NSA, the Bankruptcy Court enters an Order approving a Disclosure Statement in connection with a Plan of Reorganization proposed by a third party which Plan does not provide for payment in full in cash of the Note on the Maturity Date or upon confirmation of the proposed Plan;

    f.   Any non-monetary judgment or order with respect to a pre- or post-petition transaction or event shall be entered against the Borrowers which does or could reasonably be expected to cause a material adverse condition determined at the sole discretion of the Lender;

    g.   There occurs any effective or actual change in control of the Borrowers absent the prior written consent of the Lender; or

    h.   The Lender deems itself insecure as a result of a material adverse change in the Borrowers' financial condition, prospects, liquidity or ability to service its financial obligations;

and in every such Event of Default and at any time thereafter during the continuance of such Event of Default without further order of or application to the Bankruptcy Court the Lender may take any or all of the following actions at the same or at different times:

    i.   by notice to the Borrowers terminating the Facility;

    ii.   by notice to the Borrowers declare the Note together with all interest, fees and expenses accrued thereon to be and the Note shall thereupon become immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and

    iii.   upon written notice to the Borrowers exercise such remedies as are provided for elsewhere in this Lending Agreement, the Note, or as may otherwise be available under applicable law.

    12.   <u>No Waiver</u>.  No failure to accelerate the indebtedness evidenced hereby by reason of default hereunder, acceptance of a past-due installment or other indulgence granted from time to time, shall be construed as a novation of this Note or as a waiver of such right of acceleration or of the right of Lender to insist upon strict compliance with the terms of this Note or to prevent the exercise of such right of acceleration or any other right granted hereunder or by applicable laws.  No extension of the time for payment of the indebtedness evidenced hereby or any installment due hereunder, made by agreement with any person or entity now or hereafter liable for payment of the indebtedness evidenced hereby, shall operate to release, discharge, modify, change or affect the original liability of the Borrower hereunder or that of any other person now or hereafter liable for payment of the indebtedness evidenced hereby, either in whole or in part, unless Lender agrees otherwise in writing. This Note may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement or any waiver, change,

modification or discharge is sought.

13.     Notices. Notices under this Note shall be made as provided in the Lending Agreement.

14.     Governing Law. The validity, meaning, enforceability and effect of this Note, and the rights and liabilities of the parties, shall be determined in accordance with the laws of the State of Colorado.

15.     Schedule. Lender will enter on the Schedule the principal amount of each borrowing under the LOC by Borrower, any repayment of principal which Borrowers make, the date on which each such borrowing or repayment is made, and the outstanding Loan Amount as a result of each such borrowing or repayment. Borrowers hereby authorize Lender to make such entries and agrees that those entries and the outstanding Loan Amount as shown on the Schedule will constitute conclusive evidence of all borrowings and repayments and the dates thereof and of the outstanding Loan Amount under this Note.

Dated as of the date first set forth above.

BORROWERS:

**NORTH SHORE MANOR, INC.**

By: _____
Its: Interim CEO

4

**NORTH SHORE ASSOCIATES, LLP**

JOSHUA A. LEVIN TRUST DATED
JANUARY 1, 2020 AS AMENDED FBO
JOSHUA A. LEVIN

BY: _____
Chandra Levin, Trustee

JOSHUA A. LEVIN 2018 TRUST

BY: _____
Joshua A. Levin, Trustee

_____
Menachem M. Levin

_____
Shoshanna Levin

_____
Baruch Levin

Lynne Levin _____


ESTHER LEVIN TRUST

BY: _____
Mosh Levin, Co-Trustee

BY: _____
Esther Levin, Co-Trustee

_____
Linda Fogel

_____
Mark Kohn

_____
Beth Radetsky

5

## SCHEDULE OF BORROWINGS

| Date | Amount of Borrowing (U.S.$) | Outstanding Principal Balance |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**EXHIBIT B**

Notice of
Borrowing

DATE: _____

TO: _____

_____

SUBJECT: Revolving Credit Line Lending Agreement (the "Agreement") dated May 24, 2023, between Loveland Health, LLC (the "Lender") and North Shore Manor, Inc. and North Shore Associates, LLP. (the "Borrowers").

Pursuant to the terms of Agreement the Agreement, _____ North Shore Manor, Inc. or _____ North Shore Associates, LLP hereby request a draw under the credit facility and confirms the following instructions therefor (capitalized terms not defined herein shall have the respective meanings assigned in the Agreement):

**FORM OF DRAWING** - LOAN

    Requested Date: _____
    Principal Amount: _____

**METHOD OF DRAWING**

Wire Transfer

Or

Credit to Borrower's Deposit Account# _____ maintained with the Lender.

Wire funds to:

        ABA#:
        Bank Account
        Number:
        Special
        Instructions:

**Borrower hereby certifies as follows:**

The representations and warranties set forth in the said Agreement are true and correct on and as of the date hereto.

As of the date hereof, no event has occurred and is continuing (a) constitutes an Event of Default under the Agreement, or

      (b) with the giving of notice or passage of time, or both, would constitute an Event of Default.

      The Borrower has observed and performed all of the Borrower's covenants and other

agreements, and satisfied every condition, contained in the Agreement and in the other Loan Documents, to be observed, performed or satisfied by the Borrower.

North Shore Manor, Inc.

By:_____

North Shore Associates, LLP

By:_____