UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | Case No. 23-10808-JGR |
| | ) | |
| NORTH SHORE ASSOCIATES, LLP | ) | |
| EIN:84-07066736 | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |

**OBJECTION TO MOTION TO DISMISS BANKRUPTCY CASE**

**AS ULTRA VIRES FILING**

The Debtor, North Shore Associates, LLP ("Debtor" or "NSA"), by and through its attorneys, Kutner Brinen Dickey Riley, P.C., states its Objection to the Motion to Dismiss Bankruptcy Case as Ultra Vires Filing ("Motion to Dismiss") as follows:

**Introduction**

1.       The Motion to Dismiss is, at its core, an attempt by J. Robert Wilson ("Wilson"), a partner of the Debtor and its manager from 2006 through November 2022, to deprive the Debtor of the ability to seek relief under the Bankruptcy Code by purporting to be the sole person who can act on behalf of the Debtor while simultaneously serving as its primary creditor.  The only basis asserted by Mr. Wilson for dismissal is that the other partners of the Debtor were not "voting members" based on his allegation that new partners did not sign the 1974 partnership agreement after inheriting the interest, despite being the manager of the Debtor and therefore the person responsible for handling such corporate actions when each of the subsequent partners were admitted to the partnership.  Furthermore, despite the new assertion that he is one of only three voting members of the Debtor, Mr. Wilson's own actions demonstrate that he considered and treated all of the other partners as unrestricted voting partners at all times, both while acting as the manager of the Debtor, and after his removal.

2.       The newfound argument that Mr. Wilson remains the manager of the Debtor and the Debtor therefore lacked corporate authority to file its Bankruptcy Case is wholly belied by Mr. Wilson's own actions.  From preparing documents that recognized additional partners as voting partners and which documents admit new partners into the Debtor, to preparing debt repayment

1

schedules for partners whom he claims have nothing more than an economic interest, and further still to acquiring the primary secured claim against the Debtor, an act which is of itself a violation of his duties as a partner to act in the best interests of the partnership, at each turn Mr. Wilson has proved that he did considered each of the partners full, unrestricted, voting partners and recognized their authority to remove him as the manager of the Debtor.

3.      As set forth more fully herein, the Debtor has full corporate authority to file its bankruptcy case, and the Motion to Dismiss should be denied.

## Background

4.      The Debtor filed its Voluntary Petition for relief pursuant to Chapter 11 of the Bankruptcy Code on March 6, 2023 ("Petition Date").

5.      The Debtor owns certain real property located in Loveland, Colorado that is operated as a nursing home facility by a related entity, North Shore Manor, Inc. ("NSM").

6.      The Debtor was formed in 1974 as a general partnership.  A copy of the 1974 Partnership Agreement is attached hereto as Exhibit A.  At the time of its formation, NSA was comprised of seven (7) partners.  None of those partners are members of the partnership today.

7.      Since the execution of the Partnership Agreement in 1974, all of the original partners to the Partnership Agreement have either passed away or their interest was terminated.  In each instance where a partner passed away, their interest in the Debtor was inherited by one or more of their heirs.  No restrictions were placed on the heirs at the time of the inheritance.

8.      As some point after the Debtor was formed, Mr. Wilson acquired his 15% interest in the Debtor from Robert Tynan, one of the original partners of the Debtor.

9.      In the 2000s, Mr. Wilson was acting as the manager of the nursing home facility and NSM.  In 2006, the partners of NSA executed an Agreement to Amend Partnership Agreement ("2006 Amendment"), a copy of which is attached hereto as Exhibit B, pursuant to which Mr. Wilson was appointed as the manager of NSA.  Mr. Wilson remained the manager of NSA until November 2022.

10.     The 2006 Amendment contains signature lines for the following partners:[1]

---

[1] A fully countersigned copy of the 2006 Amendment exists. The current partners are only aware of the fully signed 2006 Amendment because Mr. Wilson designated the fully signed document as an exhibit in connection with the Motino to Approve Post-Petition Financing. Mr. Wilson had not provided a copy of the fully singed document to the partners prior to that point.

    a.   The Lieb Kohn Trust;

    b.   The Arie Levin Trust;

    c.   Rachel Kohn;

    d.   Fruma Levin;

    e.   The James Radestky QTIP Trust;

    f.   Goldye Radetsky;

    g.   Beth Radetsky;

    h.   Mark Kohn; and

    i.   J. Robert Wilson.

11.    Of the signatories to the 2006 Amendment, only three were original signors on the 1974 Partnership Agreement.  Contrary to Mr. Wilson's assertion, the 2006 Amendment did not create new interests or transfer interests in Debtor.  Rather the 2006 Amendment recognizes each of the nine partners existing as of the date of the 2006 Amendment.

12.    Based on the scant records provided to the Debtor by Mr. Wilson, no documents appear to exist pursuant to which five of the nine partners that signed the 2006 Amendment were formally admitted to the partnership.  Despite the lack of documentation, each of the partners, including those that were not a party to the original Partnership Agreement, were recognized as full, unrestricted partners.

13.    After 2006, the remaining original partners passed away and trusts were resolved, resulting in a change of partners over time.

14.    By way of example, Linda Fogel inherited her interest in the partnership after her parents' estates were resolved in or around 2015 or 2016.  At the time that Mrs. Fogel inherited her interest in the Debtor, Mr. Wilson was serving as the manager of the Debtor.

15.    Similarly, after Fruma Levin passed away in late 2017, her interests were inherited by a number of parties, including the Joshua Levin Trust Dated January 1, 2020, the Joshua Levin 2018 Trust, the Esther Levin Trust, Boruch Levin, Menachem Levin, Lynne Levin, and Shoshanna Levin (collectively the "Levin Parties").  At the time that the Levin Parties inherited their interests in the Debtor, Mr. Wilson was serving as the manager of the Debtor.

16.    While acting in his capacity as manager, Mr. Wilson was generally responsible for handling the affairs of NSA, including maintenance of the partnership records, maintaining partnership accounts, and handling the transfer of partnership interests.

17.     In September 2015, Mr. Wilson converted the Debtor to a limited liability partnership.  The other partners were not notified of the conversion, nor was a meeting called to authorize the conversion.

18.     To date, Mr. Wilson has not produced any documents to the Debtor or the other partners of the Debtor formally admitting Mrs. Fogel or the Levin Parties to the Trust.  However, there is no question that at all times relevant hereto, Mr. Wilson treated the parties as full, unrestricted parties with the ability to vote on partnership affairs.

19.     For example, in 2018, Laurie Chronopolous, an accountant with Columbine Health Systems, a company owned and operated by Mr. Wilson, requested signatures on a "Waiver of Beneficiary Limit Requirement by Voting Members/Managers" from the existing partners.  A copy of the communication and the Waiver are attached hereto as Exhibits C and D.

20.     The Waiver recognized four voting members as of January 2018 – J. Robert Wilson, Mark Kohn, Beth Radetsky, and Linda Fogel.

21.     The Waiver, which was drafted by Mr. Wilson, further adds the Levin Parties to the partnership.

22.     There is no indication in the waiver that the Levin Parties are being added as limited partners, or as partners with a solely economic interest and no voting rights.  Communication from counsel for the Fruma Levin Estate further confirms that "based upon [Mr. Wilson and Ms. Chronopolous's] prior emails that all of the other partners of North Shore Associates, a general partnership, are waiving any rights regarding the transfer of partnership interests[.]"  A copy of the correspondence attached hereto as Exhibit E.

23.     As the manager of the Debtor, Mr. Wilson was responsible for maintaining partnership records for the Debtor. Despite being the custodian of such records, Mr. Wilson has never produced copies of the records and has never produced copies of the Waiver or the communications related thereto.

24.     In July 2018, Mr. Wilson prepared and presented a payoff for NSA's loan.  A copy of the payoff, attached hereto as Exhibit F, requires a monthly payment for all of the partners, including the Levin Parties and Mrs. Fogel.

25.     In 2022, a dispute arose with Mr. Wilson over his management of the Debtor and NSM. As a result, in November 2022, the partners executed a Written Consent of Partners in Lieu

4

of Special Meeting to remove Mr. Wilson as manager and revoking the 2006 Amendment. A copy of the Written Consent is attached hereto as Exhibit G.

26.     At the time of its execution, Mr. Wilson did not contest the validity of the Written Consent, and did not contest his removal as manager until the Motion to Dismiss was filed, almost two months after the Debtor filed its voluntary petition for relief.

27.     To date, Mr. Wilson has not produced a single document that demonstrates that the Debtor intended to have non-voting partners at any point. Indeed, the only partnership documents provided by Mr. Wilson are approximately 30 pages of copies of annual reports filed with the Colorado Secretary of State and a copy of the 1974 partnership agreement. No other partnership documents have been produced by Mr. Wilson at any point.

28.     After his removal as manager, Mr. Wilson acquired the Note and Deed of Trust on the Debtor's real property from the prior lender. Mr. Wilson did not provide the opportunity to any other members of the partnership to participate, nor tell the partners that he was acquiring the Note. As a result of the acquisition of the Note, Mr. Wilson's company, Wapello Holdings, LLC, is the Debtor's largest, and possibly only, creditor, creating a direct conflict of interest to the extent Mr. Wilson is attempting to take any action on behalf of NSA.

29.     Without knowing that Mr. Wilson was in the process of acquiring the Note, the Debtor filed its voluntary petition for relief to avoid the potentially disastrous that could occur when the Note matured on March 7, 2023, including appointment of a receiver and possible sale of the real property.

30.     In authorizing the Debtor's bankruptcy filing, every single partner of the Debtor except Mr. Wilson executed, either electronically or physically, a copy of the Certified Copy of Resolution.

31.     The Debtor had proper corporate authority to file its Bankruptcy Case, and the Motion to Dismiss must therefore be denied.

### Legal Argument

32.     Mr. Wilson asserts that cause exists for dismissal of the bankruptcy case pursuant to 11 U.S.C. § 1112 on the basis that the case is a governance dispute between the parties. This argument is built on the premise that because Mrs. Fogel and the Levin Parties did not execute the 1974 Partnership Agreement, they did not have the consent of the partners to be admitted as

partners, and solely inherited the voting interest.  This argument seeks to take advantage of Mr. Wilson's own actions by not presenting the 1974 Partnership Agreement for signature to the inheriting parties, and further runs contrary to the Partnership Agreement, and contrary to applicable Colorado Law.

33.     Pursuant to 11 U.S.C. § 1112(b), the court may dismiss a case for cause, including gross mismanagement, loss or diminution of the estate, or failure to follow orders of the court. While a two-party dispute can serve as a "cause" for dismissal of a bankruptcy case, particularly when used as a litigation tactic, a two-party dispute does not always constitute cause when there is a legitimate purpose to be served by the Debtor's bankruptcy filing.  *In re Hyatt*, 479 B.R. 880, 892-93.

34.     This is not a "classic two-party dispute" where a debtor files to avoid judgment or as an improper litigation tactic.  Indeed, prior to the bankruptcy filing, there was *no* dispute between the Debtor and its primary creditor.  Instead, this case was filed a prophylactic measure to avoid the potentially disastrous consequences that could occur with the Note maturing on March 7, 2023 when the Debtor had no ability to repay the debt in full.

35.     Under the loan documents, upon maturity and default through non-payment, the secured creditor would have had the ability to appoint a state court receiver or effectuate its foreclosure rights under its Deed of Trust.  In the event of a foreclosure or appointment of a receivership, the property was at risk of being sold, resulting in a termination of the lease with NSM and the potential eviction of NSM from the Debtor's real property.  An eviction of NSM from the Debtor's real property would have had immediate repercussions to the health and well-being of the residents of the nursing home facility.  Thus, the Debtor's case was filed to ensure that such disastrous consequences did not occur.

36.     Nor is there truly a governance dispute in this case.  Rather, Mr. Wilson is attempting to manufacture a governance dispute.

37.     Mr. Wilson's sole basis to assert that Mrs. Fogel and the Levin Parties are not voting parties is the lack of signatures by such parties on the 1974 Partnership Agreement. As set forth above, from 2006 to November 2022, Mr. Wilson was the sole acting manager of the Debtor.  As the manager of the Debtor, it was his responsibility to maintain partnership records on behalf of the Debtor, including documents regarding the admission of partners to the Debtor.

38.     Having failed to do so, or having failed to produce records of doing so, Mr. Wilson seeks to create the false impression that Mrs. Fogel and the Levin Parties did not have the consent of the partners for their admission to the partnership, and thus received only an economic interest.

39.     Pursuant to C.R.S. § 7-60-127(1), the conveyance of an interest in a partnership does not dissolve the partnership nor entitle the new partner to partake in management of the partnership "*in the absence of an agreement*" from the other partners.  C.R.S. § 7-60-118(1)(g) further provides that "no person can become a member of a partnership without the consent of all partners[.]"

40.     Nothing in the statutes require the written consent of the partners, nor do they specify in what form the consent must be presented.  "In the absence of an agreement to the contrary, each partner is entitled to have equal rights in the management and conduct of the partnership business." *Tucker v. Ellbogen*, 793 P.2d 592, 597-98 (Colo. App. 1989) (citing C.R.S. § 7-60-118(1)(e)).

41.     With the Debtor, the consent of the partners can be clearly inferred from the actions undertaken by the partners, and the documents prepared by Mr. Wilson.

42.     For Linda Fogel, Mr. Wilson prepared documents in 2018 acknowledging that Mrs. Fogel was a voting member of the partnership.  This in and of itself is dispositive in establishing that Mrs. Fogel had an unrestricted partnership interest, and firmly establishes that Mrs. Fogel is entitled to participate in the management of the Debtor.  By Mr. Wilson's own logic, even if the Levin Parties were not admitted to the partnership, which they were, the inclusion of Mrs. Fogel as a voting member in the partnership reduces Mr. Wilson's voting interest to 20%.  With Mr. Wilson having no more than a 20% voting interest under his own logic, Written Consent effectively removed him as manager and bankruptcy filing was duly authorized by voting members of the partnership with 80% voting to file the case.

43.     The actions of the partners further evidence that the Levin Parties were admitted to the partnership with the agreement of the parties.  The 2018 Waiver, again prepared by Mr. Wilson, indicates his consent to admit the Levin Parties to the partnership, and the actions of the other partners in including the Levin Parties in every subsequent managerial decision evidences the consent of the other partners to admit the Levin Parties to the partnership.

44.     There is no agreement by the partners to restrict the rights of Mrs. Fogel or the Levin Parties to participate in the management of the Debtor. Given the continued actions of all

partners in consenting Mrs. Fogel's and the Levin Parties' participation in the management of the Debtor, and the absence of any agreement to the contrary, Mrs. Fogel and the Levin Parties have unrestricted partnership interests in the Debtor with appurtenant voting rights.

45.     Because Mrs. Fogel and the Levin Parties have voting rights in the Debtor, the Written Consent removing Mr. Wilson was effective, with well over 75% of the partnership interests voting to remove Mr. Wilson.  Furthermore, more than 75% of the partners voted to proceed with the bankruptcy filing.

46.     Accordingly, the Debtor's bankruptcy filing was duly authorized and was not an ultra vires filing.

47.     Mr. Wilson has therefore failed to establish cause for dismissal, the Motion to Dismiss must be denied.

WHEREFORE, the Debtor prays the Court make and enter an Order denying the Motion to Dismiss and for such further and additional relief as to the Court may appear just and proper.

Dated: May 24, 2023                         Respectfully submitted,

By:    /s/ Keri L. Riley
          Keri L. Riley #47605
          **KUTNER BRINEN DICKEY RILEY, P.C.**
          1660 Lincoln Street, Suite 1720
          Denver, CO 80264
          Telephone: (303) 832-2400
          E-Mail: klr@kutnerlaw.com

**Exhibit A**

PARTNERSHIP AGREEMENT

OF

NORTH SHORE ASSOCIATES

This General Partnership Agreement made and entered into at Denver, Colorado, this 1st day of March, 1974, by and among Robert M. Tynan, 2805 South Raleigh, Denver, Colorado 80236; Leib Kohn, 1575 Utica Street, Denver, Colorado 80204; Rachel Kohn, 1575 Utica Street, Denver, Colorado 80204; Arie Levin, 1675 Tennyson Street, Denver, Colorado 80204; Fruma Levin, 1675 Tennyson Street, Denver, Colorado 80204; James B. Radetsky, 6784 E. Cedar Avenue, Denver, Colorado 80222; and Goldye Radetsky, 6784 E. Cedar Avenue, Denver, Colorado 80222.

WITNESSETH:

FORMATION OF THE PARTNERSHIP.
1.1   Formation

The Partners agree to and do hereby form a Partnership to be governed and controlled by the agreements, terms and conditions hereinafter set forth.  The rights, liabilities and other matters not defined or provided for herein shall be governed and controlled by the Colorado Uniform Partnership Act.

1.2   Name.

The name of the Partnership shall be North Shore Associates. The business of the Partnership may, however, be conducted under any other name or style necessary to comply with the statutory requirements of any state or other governmental jurisdiction in which it may elect to do business, or that may be selected by the Partners to avoid conflict with the name of any other person, firm or corporation.

1.3   Purpose.

The principle business of the Partnership shall be for the purpose of acquiring for investments purposes and operating the

-1-

nursing home business known as North Shore Manor located at 1365 N. 29th Street, Loveland, Colorado, including the real property and improvements thereon and all other assets of the business both tangible and intangible and such other purposes as the Partnership may hereafter determine.

The Partners may engage in any transaction or do any act or thing necessary, appropriate or convenient in connection with the foregoing, including but not by way of limitation, borrowing or investing funds, issuing or purchasing evidences of indebtedness and creating liens, security interest or other encumbrances on any or all of its assets.  The Partnership may itself or through contracts with others develop, sell, lease, encumber otherwise, dispose of all or any portion of its assets.

### 1.4 Term.

The Partnership shall begin on the date hereof, and shall continue until terminated as hereinafter provided.

### 1.5 Location of Principle Place of Business.

The principle place of business of the Partnership shall be at 1365 N. 29th Street, Loveland, Colorado, but the Partnership shall have the right and power at any time and from time to time to change its principle place of business to any other location within or out of the State of Colorado.

### II.

### MANAGEMENT

### 2.1 General.

The Partners shall have equal proportionate rights regarding the management of the Partnership business, and each Partner shall devote such of his time as is necessary to conduct said business. No Partner shall, on behalf of the Partnership, without the consent of the other Partners given as provided in paragraph 2.3 hereof, take any action on behalf of Partnership.

-2-

## 2.2 Other Interests.

The Partners have business interests other than this Partnership, and it is agreed that the formation of this Partnership shall not restrict them from attending to the affairs of such other businesses or engage in such other activities and businesses in the future. Such activities, however, shall not be in conflict with or adverse to the best interest of the Partnership. Transactions with affiliates of the Partners shall be in the utmost of good faith. An affiliate of a Partner means an individual, Partnership, or corporation which controls, is controlled by, or is under the control of a Partner and others.

## 2.3 Voting in Control.

Each Partner shall be entitled to cast one vote on Partnership matters for each dollar of capital contribution he has made to the Partnership as shown by his individual capital account. The Partnership shall take no action with respect to any matter unless such action be approved by the Partners representing the majority of all votes in the Partnership, provided, however, the Partnership shall not do any of the following unless the same be approved by a 3/4's majority interest of Partners, in writing:

a. Any act contrary to the terms of this Agreement or which would make it impossible to carry out the ordinary business of the Partnership.

b. Sell, encumber or otherwise dispose of Partnership real property or execute any deed or other instrument affecting title to Partnership real property.

c. Sign, transfer or pledge any Partnership personal property for other than a Partnership purpose.

d. Endorse any note, act as an accommodation party or otherwise become surety for any person or borrow or lend money, or make, deliver or accept any commercial paper or execute any mortgage deed, deed of trust, bond or lease.

-3-

e.  Distribute cash or other property of the Partnership to the Partners.

f.  Dissolve or terminate the Partnership (except as otherwise provided herein).

g.  Admit new Partners except in accordance with the provisions of this Agreement.

h.  Make single expenditures in the ordinary course of business in excess of $500, exclusive of payments of interest and principal on Partnership obligations and taxes on Partnership property.

i.  Assign, pledge, or compromise or release any claim or debts due to Partnership except on payment in full.

j.  Arbitrate any dispute of the Partnership.

k.  Make an assignment for the benefit of creditors.

2.4  Compensation

No Partner shall receive any compensation for services rendered to the Partnership except as agreed upon by all the Partners.

2.5  Meetings

The Partnership shall hold meetings from time to time as agreed to by the Partners for the purpose of carrying out its functions and may establish such reasonable rules as are in its best interest to govern the proceedings of such meetings.

2.6  Execution of Documents

All documents affecting Partnership real estate and otherwise authorized for signatures provided herein shall be signed by at least two Partners (who are not husband and wife).

III.

3.1  Partnership Accounting

Complete and accurate books of account shall be kept and in the custody of a Partner designated by a majority of the partners and at a specified place designated for such purpose by the

-4-

Partnership. The books of the account shall be opened to inspection by any Partner or his authorized representative at any reasonable time. The Partnership books shall be kept on a cash basis unless otherwise agreed by a majority of the Partners. The Partnership's fiscal year shall be either a fiscal or calendar year, as may be determined by a majority of the Partners, which shall be the Partnership accounting period.

### 3.2 Examination and Reports

The books of the account shall be closed promptly after the close of each Partnership accounting period or upon completion of the Partnership's business, if that shall occur prior to the end of an accounting period. An annual examination and review of such books shall be performed and, at the request of any Partner, such review be by an independent certified accountant selected and paid for by the requesting Partner unless a majority of the Partners otherwise agree. Promptly thereafter, a written report shall be submitted to each Partner which shall include a statement of income and expense for such accounting, a statement of each Partner's capital account, and income or loss and such additional statements as are considered necessary to advise the Partners properly concerning their investment in the Partnership. On or before March 1 of each calendar year (unless otherwise agreed), each Partner shall be delivered a copy of the Partnership State and Federal income tax returns showing his or her distributive share of income and expenses for tax reporting purposes. In the absence of request for review as hereinabove provided, such financial statements and the information contained therein shall be deemed conclusive and binding upon the parties unless written objection shall be lodged with the Partnership by any Partner within 30 days after the mailing of such report to the Partners.

-5-

## IV.

## PARTNERSHIP CAPITAL

### 4.1 Initial Capital Contributions.

Each Partner hereby agrees to pay when due his pro rata share of the money required by the Partnership to accomplish its stated goals in the percentages set forth below:

| Partner | Pro Rata Share |
|---|---|
| Robert M. Tynan | 25% |
| Leib Kohn | 12.5% |
| Rachel Kohn | 12.5% |
| Arie Levin | 12.5% |
| Fruma Levin | 12.5% |
| James B. Radetsky | 12.5% |
| Goldye Radetsky | 12.5% |

The initial required capital contributions and the te said sums are due shall be determined by the unanimous vote of the Partners. Subsequent required contributions and the date said sums are due shall be decided by a majority vote of the Partners.

### 4.2 Additional Capital Contributions.

The Partnership may, from time to time, require additional capital contributions from the Partners in such amounts and at such times as may be determined by the Partnership to pay the ordinary necessary expenses of the Partnership. To the extent Partnership income is insufficient, the Partnership may require additional contributions each year to make the principal or interest payments on Partnership indebtedness, any management expenses, annual property taxes, legal, accounting and other professional expenses, maintenance expenses of the property and reasonable reserves for all such expenses. Additional capital contributions shall be called for by the Partnership by written notice mailed or delivered to each of the Partners at his address on file with the Partnership at least 30 days in advance of the due date for additional contributions specified therein, provided no written notice or approval by the Partnership shall be necessary to call for additional contributions for the discharge of principal, interest

-6-

and real estate tax obligations of the Partnership, since notice of such contributions is automatically given as follows: Notice of principal and interest obligations shall be deemed given by the terms of note evidencing such obligations and notices, and notice of real estate taxes shall be given by the last day provided by law before such taxes are delinquent. All contributions in such cases are due on the date the underlying obligation is due, as provided and payable by each Partner in proportion to his Partnership interest. Where written notice is required, such notice shall specify the total additional capital contributions necessary, the pro rata portion assessed against each Partner, and the due date of the additional contribution. Each Partner agrees to pay to the Partnership his or her additional capital contribution on or before the due date provided in such notice, and to become personally obligated therefor. Failure of a Partner to pay such additional capital contribution as specified in such notice within 10 days after the due date thereof shall constitute a default by the Partner.

4.3   Default on Additional Contribution.

In the event a Partner fails to make a capital contribution as herein provided or fails to pay his or her pro rata share of any subsequent contribution determined to be necessary, the other Partners may, on a pre-emptive basis pay such contribution for such defaulting Partner, and such defaulting Partner shall forfeit a portion of his interest to the other Partner or Partners who may make such payment in his stead. The amount of such forfeiture shall be a percentage amount taken from the defaulting Partner's ownership in the Partnership, and that percentage will then be added to the percentage ownerships of the other Partners making such payment. Each Partner's pro rata share shall thereby be changed proportionally.

The percentage amount to be subtracted from the defaulting Partner's interest shall be determined by the following formula:

All capital contributions presently required by the defaulting
Partners shall be added to all capital contributions previously
made by him.  This figure shall represent the denominator of a
fraction.  The numerator of a fraction shall be that sum which
has been paid by the remaining Partners in the stead of the
defaulting Partner.  The percentage amount which equals the above
mentioned fraction shall then be added to the Partners' pro rata
share who paid the capital contribution in the stead of the
defaulting Partner.

4.4 Form of Contributions.

Both the initial capital contributions and subsequent
additional contributions, if any, may be satisfied by Partnership
borrowing, personally guaranteed by all Partners subject to the
provisions of paragraph 4.5.

4.5 Guarantees of Partners.

The Partners may from time to time in connection with
Partnership borrowing be required to guaranty, jointly and
severally, Partnership obligations.  Each Partner agrees that his
ultimate liability with respect to obligations of this nature on
which the Partnership defaults shall be proportionate to his
Partnership interest, and agrees to contribute to the Partnership
such capital as may be necessary to satisfy such liability when
called upon to do so by either the Partnership or its lender.  If
the Partners shall be called upon, as guarantors, to pay with their
personal funds obligations on which the Partnership is in default,
such calls shall be equivalent to 30 days advance notice to make
an additional capital contribution under paragraph 4.2 whether or
not 30 days have expired since such call, and any Partner's failure
to timely pay the required amount shall constitute a default and
thereby invoke the default procedures provided for in paragraph 4.3.

V.

PARTNERSHIP PROFITS AND LOSSES,
DISTRIBUTIONS AND NET PROCEEDS

-8-

5.1 All Partnership profits and losses, distributions and net proceeds, as determined at the end of each fiscal year or at any other time period agreed upon by the Partners, shall be allocated on a pro rata basis to each of the Partners in accordance with the ownership percentages then in effect.

VI

DISSOLUTION AND TRANSFER OF PARTNERSHIP INTEREST

6.1 <u>Voluntary termination.</u>   The Partnership may be dissolved at any time by a majority vote of the Partners, in which event the Partners shall proceed with reasonable promptness to liquidate the business of the Partnership.

6.2 <u>Dissolution.</u>  In the event of dissolution or winding up of the Partnership, the liabilities of the Partnership shall be paid as provided by the Uniform Partnership Act of Colorado.  All the property and other assets of the Partnership including, but not limited to land leases equipment and appurtenances shall then be distributed to each Partner in accordance with the ownership percentages then in effect.

Partners shall be reimbursed solely from the assets of the Partnership with the return of their respective contributions, and if the said assets of the Partnership after the payment and discharge of all of the debts and liabilities of the Partnership are insufficient to return the capital contributions of the Partners, the Partners shall have no recourse against the Partnership or other Partners.

Liquidation and winding up of the affairs of the Partnership as provided herein shall be conducted and managed exclusively by the Partners collectively.

Distribution of assets in accordance with the terms of this Agreement may be made wholly or partially in kind by distributing to the Partners an undivided interest in the assets of the

-9-

Partnership.  In the event the Partnership is dissolved and the assets at the time of dissolution are not sufficient to pay all outstanding liabilities, each of the Partners shall be liable for said liabilities of the Partnership to the extent of each of the Partner's pro rata share or interest in the Partnership.

6.3 Sale of Partnership Interest.  Each Partner shall have the right to sell all or any portion of his Partnership interest upon giving at least 60 days advance notice to the Partnership.  The notice shall contain the name of the proposed buyer and the terms of the sale.  The sale of a Partnership interest shall have no effect upon the continuance of the Partnership business.  Upon notice of a sale as provided, the remaining Partners shall have the first right, on a pre-emptive basis, to purchase the selling Partner's interest in the Partnership at the price and on the terms contained in the notice of sale, or to terminate or liquidate the Partnership business.

If the remaining Partners exercise their right to purchase the selling Partner's interest such election shall extend to all and not less than all of such interest.  Should any remaining Partner not elect to exercise his pre-emptive rights, then any other remaining Partner may purchase the non-electing Partner's pro-rata share of the selling Partner's interest, and thereby increase his percentage ownership in the Partnership.  Such right must be exercised, if at all, within the 60 day notice period, and if not exercised, the selling Partner shall be entitled to sell his interest to any person in accordance with the offer received by him provided the instrument of assignment is in a form satisfactory to the Partnership, and the purchaser agrees and consents to be bound by the provisions of this Agreement.  An assignee of a selling Partner shall not become a Partner in the Partnership unless the remaining Partners, by unanimous consent, admit the assignee as a Partner.

**6.4** <u>Death or Disability of Partner</u>. The following provisions shall govern in case of the death or legal disability (hereafter included in the term "death") of a Partner:

(a) Upon the death of any Partner and subject to the conditions which follow the personal representative or legal successor (hereafter called the "representative") of such deceased Partner's estate shall have 90 days to elect to continue in the Partnership as a Partner or to sell the deceased Partner's Partnership interest. Such election shall be exercised by written notice delivered to the Partnership within the period stated above.

(b) If the representative elects to continue in the Partnership, he shall (i) execute a copy of this Agreement, (ii) submit a written statement satisfactory to the Partnership to the effect that upon distribution of the estate as provided by applicable law no more than three persons shall succeed to all interest of the deceased Partner in the Partnership and that such persons will execute a copy of this Agreement upon distribution (trust or agency agreements may be established to circumvent this rule in case the decedent's interest is to be distributed to more than three persons) and (iii) agree to pay all Partnership obligations applicable to the deceased Partner's interest pending distribution. Once election has been made to continue in the Partnership, a subsequent sale of the decedent's Partnership interest shall be governed by Paragraph 6.3.

(c) If the representative elects to sell the decedent's interest then the surviving Partners shall have the right either to purchase the interest of the decedent in the Partnership on a preemptive rights basis or to terminate and liquidate the Partnership business and, their failure to elect either of such alternatives in the manner provided for herein, shall constitute their consent that the representative be free to sell the decedent's interest as provided at subparagraph (g). If the surviving Partners elect to

-11-

purchase the decedent's interest they shall serve notice in writing of such election within 60 days after receipt by the Partnership of the election of the representative to sell the decedent's interest. Such notice shall be served upon the person delivering the written notice to the Partnership of the election to sell.

(d)  If the surviving Partners elect to purchase the interest of the decedent in the Partnership, the purchase price shall be equal to the fair market value of the decedent's interest in the Partnership as of the date of his death.  If fair market value is the purchase price, it shall be established by an independent appraiser who shall be agreed upon in good faith by the surviving Partners and the representative of the deceased Partner. Such appraiser shall be instructed to determine the fair market value of the deceased's interest in the Partnership as of the date of his death considering all applicable valuation factors including the fact that the decedent's interest is subject to the terms of this Agreement.  If the fair market value thus established by the appraiser is not satisfactory to either the surviving Partners or the representative of the deceased Partner, such dissatisfied parties or party may cause another appraisal to be made and the fair market value established thereby shall be averaged with the fair market value of the first appraisal to determine the fair market value of the decedent's interest for the purposes hereof. The cost of the first appraisal shall be borne by the Partnership. The cost of the second appraisal, if any, shall be borne by the party or parties requesting it.

(e)  The purchase price when determined by the foregoing shall be payable by the surviving Partners who have elected to purchase the decedent's interest by assuming that portion of the Partnership debt, if any, attributable to the decedent's Partnership

-12-

interest, and by paying the balance thereof by their promissory note providing for the payment of the principal amount thereof in four equal quarterly installments commencing on the first day of the second month following the month that the purchase price was determined.  Interest on all unpaid principal shall be paid on the same dates as principal and interest on the unpaid principal shall accrue at the rate of 3% per annum.

(f)   The surviving Partner's right to purchase the interest of a deceased Partner shall extend to all and not less than all of such interest.

(g)   If the surviving Partners do not elect to purchase the interest of the decedent in the Partnership they may proceed with reasonable diligence to liquidate the business of the Partnership in accordance with the procedures stated at Paragraph 6.1 with reference to voluntary termination.  If they do not elect to liquidate the business of the Partnership, then the representative of the deceased Partner shall be entitled to sell the decedent's interest in the Partnership to any person provided the instrument of assignment is in form satisfactory to the Partnership and the purchaser agrees and consents to be bound by the provisions of this Agreement.

(h)   The provisions of this Paragraph 6.4 shall have no application in case of the death of a party hereto who owns his interest in the Partnership in joint tenancy with another party hereto.

6.5 Pledge of Partnership Interest.  No Partner shall pledge or assign his interest in the Partnership for security purposes without the written consent of the Partnership.

VII.

GENERAL PROVISIONS

7.1 Bank Accounts.  All funds of the Partnership shall be deposited in its name in such checking account or accounts as the Partners agree.           -13-

**7.2 Notices.** All notices provided for herein shall be in writing and shall be deemed given when delivered to or mailed, postage prepaid to any Partner at his or her address as shown on the signature page hereby, unless changed by notice in accordance with the provisions hereof.

**7.3 Arbitration.** Any dispute or controversy arising from this Agreement or the breach thereof shall be determined and settled by arbitration in Denver, Colorado in accordance with the rules of the American Arbitration Association. Any award rendered therein shall be final and binding upon each of the Partners, and judgment may be entered thereon in any Court having jurisdiction thereof. Arbitration as provided herein shall be a condition precedent to any legal action hereunder. Three arbitrators shall be selected in accordance with such rules. The expenses of arbitration shall be paid for as determined by the arbitrators.

**7.4 Waiver of Partition.** Each of the Partners hereby irrevocably waives any and all rights that he may have to maintain any action for partition with respect to his interest in the Partnership, the Partnership's interest in any property and any right to compel to settle thereof. Each Partner also irrevocably waives any right he may have to force or compel the dissolution of the Partnership except in accordance with this Agreement.

**7.5 Remedies.** The Partnership and the respective Partners shall have all remedies provided by law in the event of any violation of the provisions of this Agreement, including specific performance and injunction, it being acknowledged and agreed that any violation of this Agreement shall cause irreparable injury to the non-violating parties and deprive them of an adequate remedy in law.

**7.6 Trade Name Affidavit.** The Partners shall promptly file a trade name affidavit in compliance with applicable law

**7.7 Construction.** In construing this Agreement the

-14-

plural shall include the singular, the singular the plural, and genders may be interchanged.

7.8 <u>Governing Law.</u>  This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the laws of the State of Colorado.

7.9 <u>Benefit.</u>  This Agreement shall be binding upon the parties hereto, their heirs, successors, personal representatives and assigns.

Executed as of the day and year first above written.

_____
Robert M. Tynan
2805 South Raleigh
Denver, Colorado  80236

_____
Leib Kohn
1575 Utica Street
Denver, Colorado  80204

_____
Rachel Kohn
1575 Utica Street
Denver, Colorado  80204

_____
Arie Levin
1675 Tennyson Street
Denver, Colorado  80204

_____
Fruma Levin
1675 Tennyson Street
Denver, Colorado  80204

_____
James B. Radetsky
6784 E. Cedar Ave.
Denver, Colorado  80222

_____
Goldye Radetsky
6784 E. Cedar Ave.
Denver, Colorado  80222

-15-

Exhibit B

## Agreement to Amend Partnership Agreement

This agreement is made and entered at Denver, Colorado this __1st__ day of __October__, 2006 by and between Fruma Levin, Arie Levin Family Trust, Rachel Kohn, Leib Kohn Trust, James B. Radetsky QTIP Trust, Goldye Radetsky, Beth Radetsky, Mark or Monica Kohn, and J Robert Wilson.

WHEREAS, Fruma Levin, Arie Levin Family Trust, Rachel Kohn, Leib Kohn Trust, James B. Radetsky QTIP Trust, Goldye Radetsky, Beth Radetsky, Mark or Monica Kohn, and J Robert Wilson have heretofore been engaged as partners in the business of acquiring and operating a certain nursing home property in Loveland, Colorado under the name of North Shore Associates, a partnership, pursuant to an agreement dated March 1, 1974;

NOW, THEREFORE, the partners hereto agree to grant J Robert Wilson, the managing partner, the following rights and powers, until such time as rights and powers are revoked by written decree by three-fourths majority of the partners:

1. To encumber Partnership Real Property or Personal Property and execute any deeds or other instruments effecting the title to such property, as long as the aggregate of all combined encumbrances does not exceed 80% of the appraised value of the combined Partnership Real Property and Personal Property.
2. To endorse notes, borrow money, and execute any mortgage, deed of trust, bond or lease so as not to restrict partnership business, as long as the aggregate of all combined encumbrances does not exceed 80% of the appraised value of the Partnership Real Property and Personal Property.
3. To distribute funds of the partnership to the partners in reasonable amounts and according to their partnership interest.
4. To make single expenditures in the ordinary course of business up to but not to exceed $5,000.00.
5. To sign any documents relating to the above, as an individual and singly.

Except as modified by this agreement, the partnership agreement of March 1, 1974, shall continue to remain in full force and effect and to regulate the affairs of the partnership and to define the rights and obligations of the partners. Wherever necessary the partnership agreement of March 1, 1974, shall be interpreted so that the rights and obligations hereunder shall inure to the benefit of and bind the parties to this agreement as if all of them had been originally

named therein.  The Partners also recognize that this Agreement to Amend the Partnership Agreement, may be executed in multiple counterparts with separate pages, and each such counterpart shall be considered an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have signed and sealed this agreement.

_____
Leib Kohn Trust

_____
Arie Levin Family Trust

_____
Rachel Kohn

_____
Fruma Levin

_____
James Radetsky QTIP Trust

_____
Goldye Radetsky

_____
Beth Radetsky

_____
Mark or Monica Kohn

_____
J. Robert Wilson

Exhibit C

From: **Mark Kohn** <markkohn@gmail.com>
Date: Wed, Jan 17, 2018 at 8:01 PM
Subject: Re: Waiver for Beneficiary Limit Requirement -North Shore
To: Chronopoulos, Laurie <Laurie.Chronopoulos@columbinehealth.com>

I must apologize. I thought I already took care of this but I just found it in my pile of mail to process.

Forms is attached

Mark Kohn

On Thu, Jan 11, 2018 at 5:27 PM, Chronopoulos, Laurie <Laurie.Chronopoulos@columbinehealth.com> wrote:

HI Mark,

Happy New Year!  Hope you are well.  I haven't received your signature yet for the waiver I mailed out early December.  Can you please sign that and email or mail it to me?

Thank you so much for your help!

Laurie Chronopoulos, CPA

Columbine Health Systems

Senior Accountant

802 West Drake Road, Suite 101

Fort Collins, CO 80526

(970) 449-5123 Direct Line

(970) 482-0198 Office

(970) 482-9148 Fax

laurie.chronopoulos@columbinehealth.com

---

PHI HIPAA & HITECH Act Compliance Statement

This communication may contain confidential Protected Health Information. This information including any attachment is intended only for the use of the individual or entity to which it is addressed. The authorized recipient of this information is prohibited from disclosing this information to any other party unless required to do so by law or regulation and is required to destroy the information after its stated need has been fulfilled. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or action taken in reliance on the contents of these documents is STRICTLY PROHIBITED by federal law. If you have received this information in error, please notify the sender immediately and delete this transmission.

Exhibit D

## Waive Beneficiary Limit Requirement by Voting Members/Managers

The undersigned, being all of the Voting Members of <u>North Shore Associates, LLC</u> do hereby take the following action:

<u>Allow Fruma Levine Trust (12.5%) and Arie Levin Trust (12.5%) interests in North Shore Associates, LLC to be distributed to 4 individuals, Joshua A. Levin, Menachem M. Levin, Rabbi Boruch E. Levin and Esther Levin, the spouse of L. David Levin who is deceased, and 1 trust, Joshua A. Levin Irrevocable Trust.</u>

Printed Names and Signatures                                        Date

_____

Beth Ellen Radetsky

_____

J. Robert Wilson

_____                    1-10-18

Mark I Kohn

_____

Linda Fogel



SOLOMON,
STEINER &
PECK LTD.
ATTORNEYS AT LAW

**Exhibit E**

## Solomon, Steiner & Peck, Ltd.

### Attorneys at Law

6105 Parkland Boulevard, Suite 140
Mayfield Heights, Ohio 44124

Telephone: (216) 765-0123
Facsimile: (216) 595-2787
www.SSandPLaw.com

Toll Free: 1-888-236-5173
E-mail: msolomon@ssandplaw.com

Michael L. Solomon, Esq.

January 15, 2018

<u>VIA E-MAIL</u>
Bob Wilson <u>Bob.Wilson@columbinehealth.com</u>
and
Laurie Chronopoulos <u>Laurie.Chronopoulos@columbinehealth.com</u>

RE:  Levin Trust Distributions

Dear Bob and Laurie:

It is my understanding based upon your prior emails that all of the other partners of North Shore Associates, a general partnership, are waiving any rights regarding the transfer of partnership interests being transferred from the Ari Levin Trust and the Fruma Levin Trust to the beneficiaries of the trusts set forth below. Please transfer the partnership interests and the interests in North Shore Manor Inc., as set forth below. Please email me a draft copy of the documentation and after my review I will forward it to the beneficiaries for their signature if such is needed.

Menachem M.  Levin and Shoshanna Levin, joint with rights of survivorship
28582 Yeshiva Lane
Wickliffe, Ohio. 44092     - 6.25%
TIN 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

Baruch Levin and Lynne Levin, joint with rights of survivorship
26170 Raine
Oak Park, Michigan 48237  -  6.25%
TIN 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

---

Mayfield Heights • Independence • Westlake

January 15, 2018
Page 2

SS&P Solomon, Steiner & Peck, Ltd.

ATTORNEYS AT LAW

Esther Levin Trust, Mosh Levin and Esther Levin, co- trustees
952 W. Kennedy Blvd.
Lakewood, N.J. 08701    -    6.25%
TIN 82-6602325

Joshua A. Levin 2008 Trust, Joshua A. Levin, Trustee
3527 Severn Road
Cleveland Heights, Ohio 44118 - 3.125%
TIN 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

The Fruma Levin Trust dated July 16, 2000 as amended
fbo Joshua A. Levin, Channa Levin, trustee
3527 Severn Road
Cleveland Heights, Ohio 44118 - 3.125%
TIN 82-6560299

Sincerely,

*Michael L. Solomon*

Michael L. Solomon

MLS:brt
cc: Joshua Levin

Mayfield Heights • Independence • Westlake

Exhibit F

| SHAREHOLDERS | OWNERSHIP | NORTH SHORE ASSOCIATES LOAN PAYOFF LOAN BALANCE @ 7/31/18 | ADDITIONAL MONTHLY PMT |
|---|---|---|---|
| Fruma Levin Trust Amend | 3.125% | $71,137.34 | $466.96 |
| Joshua Levin 08 Trust | 3.125% | $71,137.34 | $466.96 |
| Esther Levin Trust | 6.250% | $142,274.68 | $933.92 |
| Baruch & Lynne Levin | 6.250% | $142,274.68 | $933.92 |
| Menachem & S. Levin | 6.250% | $142,274.68 | $933.92 |
| B. Radetsky | 11.250% | $256,094.43 | $1,681.06 |
| L. Fogel | 18.750% | $426,824.05 | $2,801.76 |
| M. Kohn | 30.000% | $682,918.48 | $4,482.82 |
| R. Wilson | 15.000% | $341,459.24 | $2,241.41 |
| Total | 100.000% | $2,276,394.92 | $14,942.73 |

Current Loan matures 3/7/2023 - $14,942.73 (monthly P&I)  - current rate is 3.9% fixed

**ANALYSIS**

| ADDITIONAL ANNUAL PMT | INTEREST EARNED | LOAN BALANCE @3/7/2023 |
|---|---|---|
| $5,603.52 | 7.88% | $57,336.34 |
| $5,603.52 | 7.88% | $57,336.34 |
| $11,207.05 | 7.88% | $114,672.68 |
| $11,207.05 | 7.88% | $114,672.68 |
| $11,207.05 | 7.88% | $114,672.68 |
| $20,172.69 | 7.88% | $206,410.82 |
| $33,621.14 | 7.88% | $344,018.04 |
| $53,793.83 | 7.88% | $550,428.86 |
| $26,896.91 | 7.88% | $275,214.43 |
| **$179,312.76** | | **$1,834,762.88** |

### NORTH SHORE ASSOCIATES LOAN PAYOFF ANALYS

| SHAREHOLDERS | OWNERSHIP | LOAN BALANCE @ 7/31/18 | ADDITIONAL MONTHLY PMT |
|---|---|---|---|
| Fruma Levin Trust Amend | 3.125% | $71,137.34 | $466.96 |
| Joshua Levin 08 Trust | 3.125% | $71,137.34 | $466.96 |
| Esther Levin Trust | 6.250% | $142,274.68 | $933.92 |
| Baruch & Lynne Levin | 6.250% | $142,274.68 | $933.92 |
| Menachem & S. Levin | 6.250% | $142,274.68 | $933.92 |
| B. Radetsky | 11.250% | $256,094.43 | $1,681.06 |
| L. Fogel | 18.750% | $426,824.05 | $2,801.76 |
| M. Kohn | 30.000% | $682,918.48 | $4,482.82 |
| R. Wilson | 15.000% | $341,459.24 | $2,241.41 |
| Total | 100.000% | $2,276,394.92 | $14,942.73 |

Current Loan matures 3/7/2023 - $14,942.73 (monthly P&I)  - current rate is 3.9% fixed

**SIS**

| ADDITIONAL ANNUAL PMT | INTEREST EARNED |
|---|---|
| $5,603.52 | 7.88% |
| $5,603.52 | 7.88% |
| $11,207.05 | 7.88% |
| $11,207.05 | 7.88% |
| $11,207.05 | 7.88% |
| $20,172.69 | 7.88% |
| $33,621.14 | 7.88% |
| $53,793.83 | 7.88% |
| $26,896.91 | 7.88% |
| **$179,312.76** | |

**Exhibit G**

## NORTH SHORE ASSOCIATES

### WRITTEN CONSENT OF PARTNERS
### IN LIEU OF SPECIAL MEETING

The undersigned, representing more than three-fourths of the voting interests of the Partners of North Shore Associates, a Colorado limited liability partnership (the "Partnership"), pursuant to the provisions of the Partnership Agreement of North Shore Associates dated March 1, 1974 (the "Partnership Agreement"), adopt the following resolutions in lieu of holding a formal meeting of the Partners:

> WHEREAS, Section 2.1 of the Partnership Agreement provides that the Partners have equal proportionate rights regarding the management of the Partnership's business; and

> WHEREAS, Section 2.3 of the Partnership Agreement provides that the Partnership shall take no action with respect to certain matters unless such action is approved by the Partners representing a three fourth's majority of all votes in the Partnership; and

> WHEREAS, Section 2.3 of the Partnership Agreement further provides that the action requiring three-fourth's majority approval of the Partners be in writing.

**NOW, THEREFORE**, it is hereby:

> RESOLVED:  David Fogel and A. Mayer Kohn are authorized to sign and endorse checks in the Partnership's name and on the Partnership's behalf and to manage bank accounts held in the Partnership's name.

*[Signature pages to follow]*

Executed on the latest date set forth beside the respective Partners' signatures below.

JOSHUA A. LEVIN TRUST DATED
JANUARY 1, 2020 AS AMENDED FBO
JOSHUA A. LEVIN

BY: _____     12/20/2022
   Chandra Levin, Trustee                   Date
   Channa

JOSHUA A. LEVIN 2018 TRUST

BY: _____     12/20/2022
   Joshua A. Levin, Trustee                 Date

ESTHER LEVIN TRUST

BY: _____     _____
   Mosh Levin, Co-Trustee                   Date

BY: _____     _____
   Esther Levin, Co-Trustee                 Date

_____          _____
Baruch Levin                               Date

_____          12/20/2022
Menachem M. Levin                          Date

_____          _____
Lynne Levin                                Date

_____          _____
Linda Fogel                                Date

_____          12/20/2022
Shoshanna Levin                            Date

40724597 2                    -2-

BY:

Esther Levin, Co-Trustee

_____
Date

Baruch Levin

12/20/2022
_____
Date

Date

Menachem M. Levin
Date

_____
Date

Lynne Levin        *Lynne Levin*

12/20/2022
_____
Date

Linda Fogel

_____
Date

Shoshanna Levin
Date

_____
Date

Mark Kohn
Date

Beth Radetsky
Date

2

Executed on the latest date set forth beside the respective Partners' signatures below.

JOSHUA A. LEVIN TRUST DATED
JANUARY 1, 2020 AS AMENDED FBO
JOSHUA A. LEVIN

BY: _____          _____
      Chandra Levin, Trustee                                          Date


JOSHUA A. LEVIN 2018 TRUST

BY: _____          _____
      Joshua A. Levin, Trustee                                       Date


ESTHER LEVIN TRUST

BY: _____          12/20/2022
      Mosh Levin, Co-Trustee                                      Date

BY: _____          12/20/2022
      Esther Levin, Co-Trustee                                     Date


_____                _____
Baruch Levin                                                          Date


_____                _____
Menachem M. Levin                                               Date


_____                _____
Lynne Levin                                                           Date


_____                _____
Linda Fogel                                                            Date


_____                _____
Shoshanna Levin                                                   Date


40724597.2                                    -2-

Joshua A. Levin, Trustee

Date

ESTHER LEVIN TRUST

BY:

Mosh Levin, Co-Trustee
Date

BY:

Esther Levin, Co-Trustee

Date

Baruch Levin

Date

Menachem M. Levin
Date

Lynne Levin

Linda Fogel

12/20/2022
Date

Shoshanna Levin
Date

Mark Kohn
Date

Beth Radetsky

Date

(2 of 2)

_____       12/20/2022
Mark Kohn                                     Date

_____       _____
Beth Radetsky                                 Date

Mark Kohn _____    _____ Date

*Beth Radetsky*
Beth Radetsky _____    12/20/2022
                                          _____ Date