## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

IN RE:                                      )
                                            )
NORTH SHORE ASSOCIATES, LLP    )    Case No.  23-10808-JGR
                                            )
      Debtor.                          )    Chapter 11
                                            )

### MOTION TO DISMISS WITH TURNOVER OF CASH COLLATERAL

Wapello Holdings LLC ("Wapello") and J. Robert Wilson ("Bob") by and through their attorneys, Spencer Fane LLP, for their Motion to Dismiss With Turnover Of Cash Collateral states as follows:

A.    <u>The Movants</u>

1.    Movant Wapello Holdings LLC ("Wapello") holds a Deed of Trust loan on the Debtor's real estate with an unpaid balance of $1,834,368.64 as of the March 6, 2023 Petition date. The note securing the Deed of Trust matured on March 7, 2023.  The Debtor filed its petition on the day before the Note matured. The Debtor has not made any payments to Wapello after the Petition Date.  As of May 15, 2024 the Note has an unpaid balance of $2,239,231.03 plus attorney fees and costs.

2.    Movant Bob Wilson ("Bob") owns 15% of the partnership interests in the Debtor. Bob owns 27% of the voting rights in the Debtor. Bob is the Debtor's managing partner.

B.    <u>The Debtor's Business</u>

3.    The Debtor's only asset is a building which it leases to an affiliate named North Shore Manor, Inc ("NSM").

4.    The Debtor and NSM have identical ownership with Bob owning 15% and others who inherited their shares owning 85% (the "Heirs").

DE 8729065.1

5.      The Debtor's Petition (Doc. 1) designates the Debtor as a single asset real estate case as defined in 11 U.S.C. § 101(51B).

6.      The Debtor has no employees or operations other than leasing its building to NSM.

7.      Wapello holds the real estate loan on the Debtor's building. Wapello is the Debtor's only creditor.

C.      <u>Procedural Background</u>

8.      On March 6, 2023 the Debtor filed its Petition (Doc. 1).

9.      Also on March 6, 2023 NSM also filed a bankruptcy petition, case No. 23-10809.

10.     On March 21, 2023 the Debtor filed a Corporate Resolution (Doc. 27) stating that the Debtor "duly held according to law" a partners meeting to authorize the Petition. This was not true. Bob had no notice of a meeting and was excluded from the secret meeting after he expressed his opinion that a bankruptcy filing was not necessary and not in the best interest of the Debtor or the residents in the Debtor's building.  NSA's partnership agreement did not authorize partnership meetings to be conducted in this manner.

11.     On April 17, 2023 Wapello filed its Notice Pursuant To 11 U.S.C. section 546(b) to perfect its lien on the buildings rental income which constituted Wapello's cash collateral pursuant to the rents, issue and profits  clause of the Deed of Trust securing the Debtor's property.

12.     On May 2, 2023 Bob and Wapello filed a Motion To Dismiss this case (Doc. 99) because this case is an ultra virus filing and is unnecessary:

> A.      As stated in the motion, the required governance procedure was not filed to authorize the Petition and there was not sufficient affirmative votes to authorize the Petition; and

DE 8729065.1

     B.     Section 4.2 of the Debtor's Partnership Agreement requires a capital call in the event of a default on the real estate loan Wapello holds, and although the partners have the financial capacity to fund capital contributions they did not do so.

13.     On May 31, 2023 the Court held a hearing and issued Minutes of the Proceeding holding Wapello's motion to dismiss in abeyance and ordered Bob to file a Motion to Compel Arbitration. (Doc. 157).  This case has been in abeyance for almost a year.

14.     On June 6, 2023 Bob filed his Motion to Compel Arbitration  (Doc. 160).

15.     On  June 13, 2023 both the Debtor and NSM Objected to Arbitration.  (Doc. 168 and 169).

16.     On July 12, 2023 the Debtor filed a plan, the main feature of which was "Exculpation" of the Heirs and their professionals from liability for their actions.

17.     On July 21, 2023 the Court ordered Arbitration. (Doc. 195).

18.     On September 19, 2023 Bob filed his Notice Re: Demand For Arbitration (Doc. 203). An arbitration is set during 2025.

19.     On October 23, 2023 the Debtor filed monthly operating reports for the months of June, July and August, 2023 (Doc. 214, 215 and 216).

20.     On December 13, 2023 the Debtor filed monthly operating reports for September, October, and November 2023 (Doc. 218, 219 and 220).

21.     On May 1, 2024 the U.S. Trustee filed a Motion to Dismiss because the Debtor failed to file operating reports and pay US Trustee fees. (Doc. 226)

22.     On May 4, 2024 the Debtor filed monthly operating reports for the months of December, 2023 through March, 2024 (Doc. 229, 230, 231 and 232).

DE 8729065.1

23.     The untimely operating reports show that the Debtor misused Wapello's cash collateral without court approval and without Wapello's consent.

D.     The Petition Is Unnecessary

24.     As described in Bob and Wapello's first motion to dismiss, Section 4.2 of the Debtor's partnership agreement has a mechanism making this Bankruptcy filing completely unnecessary.   Under Section 4.2 of the partnership agreement all partners who signed the partnership agreement (such partners also having management and voting rights) agreed that all such partners shall make "additional contributions for the discharge of principal, interest and real estate tax obligations of the Partnership".  The matured promissory note held by Wapello is an obligation for which the Debtor's partners who signed the partnership agreement have an obligation to pay by capital contributions. All partners have the financial resources to pay their share of the required contribution.  Only Bob has stepped up.

E.     Two Party Case

25.     This is a two party case. Wapello is the debtor's only creditor. The only other creditor was the Larimer County Treasurer for real estate taxes which the Debtor paid post-petition by unauthorized use of Wapello's cash collateral.  A two party dispute is not suitable for bankruptcy, especially since Section 4.2 of the partnership agreement establishes a workable path to pay the only creditor.

F.     The Petition is Ultra Virus and Unlawful

26.     There was no meeting of the partnership and this Bankruptcy filing was not authorized by the company. The Heirs resolution filed at Doc. 27 described a "meeting" of the partners which never happened. Not all of the partners were informed of the meeting and not all partners signed the "Resolution" authorizing the Petition.  Bob was excluded from notice of the

4

partnership meeting after he informed the Heirs that bankruptcy was not in the best interest of the residents or the Debtor, and that the Heirs should return $1,000,000 of Covid Relief funds instead of filing bankruptcy.

G.      The Debtor Has Filed To Make Monthly Payments required by 11 U.S.C. Section 362(d)(3)

27.     The Debtor's Petition (Doc. 1) designates this case as a single asset real estate case under 11 U.S.C. 101(51B).  This case is undisputedly a single asset real estate case.

28.     The Debtor has failed to make monthly payments required by 11 U.S.C. 362(d)(3)(B).

29.     The Debtor failed to file a plan of reorganization that had a reasonable possibility of being confirmed within a reasonable period of time because the central feature of the Debtor's plan filed on July 31, 2023 was "Exculpation" of the Heirs and their professionals.  The Court stated in the NSM case that a similar plan for exculpation was unconfirmable.

30.     The consequence of the forgoing is pursuant to 11 U.S.C. 362(d)(3) Wapello is entitled to relief from stay.  There is no purpose to maintaining a case on the docket when the only creditor is entitled to relief from stay for the Debtor's only asset.

H.      The Debtor Failed To Timely File Monthly Reports

31.     As described in the U.S. Trustee's motion to dismiss (Doc 226) "the Debtor has failed to timely file operating reports through the duration of this case" and "the UST has made multiple informed requests for the Debtor to file these delinquent reports, and has received no response" until after the UST filed his motion to dismiss.

I.      The Debtor Has Misused Wapello's Cash Collateral

32.     In this Single Asset Real Estate Case the Debtor's sole income is collected rent from a single tenant in a single building. Wapello has the first (and only) deed of trust on the building

5

which contains a "rents, issue and profits clause." By virtue of Wapello's Notice Pursuant To 11 U.S.C. 546(b) Wapello perfected its lien on the building "rents, issue and profits."

33.     The Debtor collected rents from the building that constitute Wapello's cash collateral pursuant to 11 U.S.C. 363.

34.     Without court authority and without the consent of Wapello the Debtor misused and spent Wapello's cash collateral to pay real estate taxes on the building. Perhaps Wapello would have consented to the use of its cash collateral to pay real estate taxes.  But Wapello was not asked. Instead, the Debtor concealed the misuse of cash collateral by failing to file monthly operating reports.

J.     Linda Fogel's Email Demonstrates No Concern For Residents

35.     Exhibits 1 and 2 demonstrate the pressure the Heirs placed on Bob to continue to pay dividends during Covid.  Exhibit 1 is Bob's email to the Heirs dated March 23, 2020 describing the tragic news that the Debtor's Facility had a Covid outbreak.  The Debtor's facility was the first healthcare facility in Colorado to experience an outbreak. Linda Fogel was the first Heir to respond to this tragic news by an email to Bob that same evening. See Exhibit 2. Linda Fogel showed no concern for the employees, the residents or the fact that Bob just notified her of circumstances that led to deaths. Instead, Linda Fogel demanded to continue to get paid dividends.  Linda Fogel wrote:

> "the NSA rent to the partners remains due regardless of whether or not there is a dividend distribution. I assume that the partners will continue to receive their monthly percentage of rent due which in my case would be approximately $7,250 per month.  I expect the partners share of the rent will be paid in early April in the same manner is has been paid in all previous months and years.

36.     Linda Fogel insisted that Bob continue to pay her dividends regardless of Covid circumstances.  Linda Fogel copied her email to several Heirs, none of whom disagreed with her "expectation" to receive dividends during the pandemic.

37.     Linda Fogel's husband, David Fogel, claims to be the new managing partner of NSA even though there was not the required 75% of voting partners to replace Bob. David Fogel has evaded service of the subpoena by hiding in his house and refusing to answer the door.

38.     The Debtor is not a good steward of the residents' welfare. Post dismissal and going forward the Colorado Department of Health will be the better stewards of the residents' welfare.

K.     This Bankruptcy Was Preventable And Was Filed As A litigation Tactic

39.     The Debtor owns a building leased to a skilled nursing facility impacted by CoVid.  Covid Relief Funds sustained the business and funded distributions to the Heirs.

40.     The Heirs simply needed to recapitalize by returning $1,000,000 of the Covid Relief money they received to avoid risking residents' welfare and this bankruptcy filing. They had the money. Instead of recapitalizing, an Heir's son, bankruptcy attorney Meyer Kohn, developed a scheme to file bankruptcy, stick Bob with losses and to use this Court as a litigation tool to extort Bob to buy them out.

41.     The Heirs, hiding behind NSM while NSM was a debtor in possession, used NSM's attorney and NSM's funds to demand that Bob buy them out for $10,000,000 more than their interests were worth.

42.     The Heirs control this Debtor and NSM and acted in concert with NSM and its attorney.

43.     In both this case and in the NSM case the Heirs proposed plans "exculpating" the Heirs and their professional from wrongdoing.

44.     In response to the Court's order to show cause in the NSM case, NSM dismissed its bankruptcy.  NSM sued Bob and NSM's vendors immediately after the case was dismissed, and informed the state court that NSM successfully exited bankruptcy.

DE 8729065.1

45.     The Heirs have not acted in good faith and have mismanaged the Debtor to protect themselves through a fraudulent resolution to take control of the Debtor's funds and attorneys to extort Bob while seeking "exculpation" in this Court.

46.     After the NSM case was dismissed, NSM and the Debtor have not paid a penny of their $3,000,000 debts to Bob and his businesses, have paid professionals of the estates without court supervision, have not paid any dividends to equity holders, and have provided poor healthcare residents. All of this was avoidable if the Heirs simply paid back a small portion of the Covid Relief money they pocketed.

L.     <u>This Case Was Not Filed In Good Faith</u>

47.     At the July 21, 2023 hearing on the Motion to compel arbitration the Court made the following comments also relevant to this motion:

> "There has been many discovery disputes.  Some disputes are still pending.  There have been extensive discovery disputes in both cases.
>
> Here in this case, NSA claims it has not received the documents it requested from Wilson, and Wilson claims that certain of the other partners are dodging service of a Rule 2004 subpoena to produce documents and appear for depositions, and has evidence of that.  We can see the affidavits of service, return of service for non-service: Document 125, David Fogel; document 126, Linda Fogel; document 128, Mark Cohn; and document 129, Meyer Cohn.
>
> And it's noteworthy to take a look at those affidavits of service, because I, frankly, really hadn't seen that level of evasion of service before in my nearly eight years on the Bench, and nearly 41 years of practice.
>
> . . . .
>
> Curiously, an objection to the motion to dismiss was filed by NSA, not the other partners.  That's document 142.
>
> NSA, an entity, a Colorado limited liability company has chosen to side with the other partners.

DE 8729065.1

. . . .

> The disputes between the partners over control are determined by the partnership agreements, their conduct, and Colorado State Law.

. . . .

> So seeking to hide behind NSA, the other partners did not file an objection to the motion to compel arbitration, but NSA did.  NSA, which has no legal interest in the issue of who owns it, argues the Court should ignore the arbitration provision and determine the underlying disputes of who owns what between the partners.  The issue goes to subject matter jurisdiction."

48.     On October 3, 2023 the Court conducted a hearing in the NSM case on Columbine's motion for relief from stay to pick up photocopy machines located in the Debtor's building. It was Columbine's third motion for relief from stay (the first motion was to recover intellectual property to de-brand the facility; and the second was to recover medical equipment). NSM resisted all three motions, all of which were granted. At the October 3, 2023 hearing the Court made the following observations:

> This is really just a two-party dispute between the other partners, as I've defined in the arbitration order, and Mr. Wilson and his entities.
>
> And the Chapter 11 filing, to me, is just another litigation tactic in the ongoing interminable litigation between the two parties.
>
> The Department of Health and the patient care ombudsman are walking on eggshells because of the bankruptcy, and they're careful about how they're proceeding.
>
> But if there wasn't a bankruptcy case, I'm not sure what paths they would take.
>
> The Debtor is spending hundreds of thousands of dollars in professional fees to fight with Mr. Wilson and his entities, instead of focusing on what I think is the paramount purpose of the bankruptcy, which is the care of the residents.
>
> And you'll have a chance to respond to all of these points.

DE 8729065.1

The record also shows the other partners who proposed what I believe is an unconfirmable Plan, they did discovery. And if you're going to seek to be --- to file a Chapter 11 Plan and get it confirmed, good faith is one of the factors. And evading discovery, to me, is extremely troublesome.

This is an intolerable two-party dispute, incapable of resolution through a bankruptcy case. And I think the first 45 minutes on the record today proves that. We've been fighting over oxygen tanks and copy machines.

The Debtor hasn't paid any rent to the owner of the building from which it operates North Shore Associates. It proposed an unconfirmable Plan.

I will tell you right now on the record that the proponents of the Plan are not getting releases for either pre- or post-petition conduct. There is no identification of any pre-petition transfers.

And I also have concerns about the disinterestedness of counsel for the Debtor. Before the bankruptcy case filed, the other partners took over the business. So it was a takeover. Whether it was possible or not, I'm not sure.

But bankruptcy counsel for the Debtor pre-petition was negotiating on behalf of the other partners, requesting that Mr. Wilson buy their position out. And once that request was denied, then the game has been on since then.

And it's the residents of North Shore Manor who have suffered. They're just a pawn in this never-ending litigation between the other partners and the Wilson entities.

Judge Romero wrote a case called *In re Gunnison Center Apartments, LP,* 320 B.R. 391, where he opined that cause for dismissal of a Chapter 11 case, there is no roadmap, there's factors to be evaluated, but also it's really an amalgamation of the facts before the Court.

So you can continue on down this path and spend – let's see, we have $100,000.000 fee from Debtor's counsel, we have a $100,000.000 fee from Debtor's accountants, there's a management fee from the management company, and all of these fees are continuing as this progresses.

DE 8729065.1

We have a dispute over the fees of EisnerAmper, and we a dispute over is responsible for a $334,000.00 secured claim filed by the Department of Health and Human Services.

We have had discovery disputes from the beginning of the case. And there's even one that just came up now that's pending.

And so I just don't see how this is a proper subject of a Chapter 11 case.

And in terms of any potential conflict by counsel for the Debtor, I'm not making and findings that there is a conflict.  But this case was in quite an unusual posture.

It's one thing for counsel for one group of equity to negotiate with counsel for another group of equity, but what makes this case unusual is the fact that the minority equity represented by Wilson is also an unsecured creditor and was previously before the buyout he was a secured creditor.

And so I don't know who the affidavit filed with this Court, counsel for the Debtor can swear that it had no adverse interests with any class of creditors in this case.

And I think that what highlights my uncomfortableness with the present situation is this unconfirmable Plan, which drew an objection from the United States Trustee, that was many pages long. Usually the United States Trustee tries to accommodate debtors and tries to get Plans confirmed.

So the way I would like to proceed is to ask --- or to order that the Debtor and Mr. Wilson, on or before October 20, 2023, the Debtor has two issues I'd like to address:

One:   A specific written response to the consumer patient care ombudsman report; and

Two:  To tell the Court why this case shouldn't be dismissed as a two-party dispute.

I'm not going to convert the case, because that might cause the nursing home to have to shut down.

I'm not going to appoint a Chapter 11 Trustee in North Shore Manor's case, because not only an additional layer of administrative expenses, but I would never do that to someone, to inject another

DE 8729065.1

individual, and fight to the death between these two opposing parties.

So I would like a report on the patient care ombudsman on its latest report. I'd like a report as to why this case should stay in Chapter 11.

49.    Thereafter, and on October 10, 2023 the Court in the NSM case issued an "Order To Respond To Fourth Patient Ombudsman Report And Notice Of Potential Dismissal Of Chapter 11 Case." In the Order the Court:

> A.  Noted that an Ombudsman (the "Ombudsman") appointed by the Colorado of Public Health and the Environment (the" CDPHE") had issued four Ombudsman reports on NSM's healthcare facility describing that "the Ombudsman again had serious concerns about the safety of the residents, whether there had been mandatory reporting of instances of abuse and neglect, the quality of case, the quality of life, and willful interference in the Ombudsman carrying out the monitoring duties."

> B.  Concluded that the NSM's Bankruptcy Plan is "an unconfirmable plan".

> C.  Expressed serious concerns about NSM, its legal counsel and persons currently controlling NSM, including: (1) NSM proposed a Bankruptcy Plan that proposed releases of all shareholders except for Bob; and (2) and that "the Court is concerned about the impartially of Debtor's [NMS] counsel because of its previous representation of the other shareholders prior to the bankruptcy filing in negotiations attempting to compel Bob, who is both a shareholder and the primary creditor of the estate, to buy out the other shareholder's interests."

> D.  And Ordered that "the Debtor [NSM] show cause to the Court as to why the Chapter 11 case should not be dismissed".

50.    During this time, NSM's accounting professionals, Eisner Advisory Group, missed a deadline to file a report with Health and Human Services resulting in a $334,000 claim against

the NSM estate. This led to a objection to Eisner Advisory Group's fee application requesting $110,170.98 for fees.  There was substantial doubt whether Debtor's counsel and Eisner Advisory Group's fees would have been approved.  On October 25, 2023 the Court issued a Minute Order holding Eisner Advisory Group's fee application in abeyance until possible malpractice claims could be sorted out.

51.     So, to avoid Court review of fee applications, on October 26, 2023 NSM filed a motion to dismiss its own bankruptcy case.

52.     On October 27, 2023 the NSM bankruptcy case was dismissed.

53.     Ten minutes after the Court dismissed the NSM bankruptcy case NSM filed a state Court complaint against Bob and Bob's affiliates to preempt the collection of debts which were not discharged in NSM's Bankruptcy. In their state court complaint NSM spinned the court's October 10, 2023 Order to Show Cause as follows:

> "North Shore survived bankruptcy, hired a new manager, and appointed a new CEO, all of which enabled North Shore to exit bankruptcy and return to serving its patients and their families."

This course raises the question why NSA is still in bankruptcy having informed the state court that NSM "survived bankruptcy" and "return[ed] to serving its patients and families".

54.     Four days after the NSM case was dismissed the Ombudsman filed another report with the court which described the following:

- "The ombudsman received a report that Resident 5 fell and then reported pain in their hip. It was also reported that a family member of Resident 5 who fell made an allegation of neglect."

- "The resident was in bed after returning to the facility from the hospital. The family members expressed their concern and how upset they were about the incident. The ombudsman spoke with one of the family members who reported that the resident has now fallen three times within the last few months and expressed that their perspective is that the

DE 8729065.1

facility has been neglectful. Another family member visited the resident on Friday, October 13, 2023 and reported to the ombudsman they observed the resident's fall mattress, that is utilized as a safety measure on the floor near the bed when residents fall out of their bed, was rolled up."

- "The family member stated the resident fell onto the floor later in the afternoon on October 15, 2023. The family member reported the resident broke their pelvis, received a laceration to the head, and required staples to the head due to the fall."

- "The family member stated the facility knew the resident was at risk for falls. The family member informed the ombudsman that they did not think the facility was adequately checking on the resident. The family member stated that the resident may need hospice, is experiencing pain and is not coherent."

- "The ombudsman received a call on October 20, 2023, from a family member who informed the ombudsman that the resident passed away on October 19, 2023."

- "A member of the family reported to the ombudsman that the family knew the resident was declining but they thought the resident had months to live and expressed that they think the fall 'accelerated their death.' The ombudsman reported educating the family member of agencies to contact to file a complaint."

- "The ombudsman was able to meet in person during this visit with [NSM employee] Bruce on October 23, 2023 to discuss concerns regarding the fall and death of the resident. . . . [T]he ombudsman inquired with Bruce about what his understanding was about why the resident fell. The ombudsman reported that Bruce said the hospice Certified Nursing Assistant (CNA) put the fall mattress away and the facility staff should have caught this internally."

55.    The Court's instincts were correct.  The Bankruptcy led to declining care, and a resident died from a fall nine days after the Court's October 10, 2023 Show Cause Order.  The resident's family indicated that the facility was not adequately checking on the resident who was severely injured in a fall because a fall mattress was put away and was not in place.

56.     The dismissal of the NSM case avoided this Court's scrutiny of Debtor's counsel fees and Eisner Advisory Group's fees. No fee application was filed. However, it appears that NSM's counsel and Eisner Advisory Group's fees were paid because they continue to do work for the Debtor and NSM.  At the same time, NSM has not paid a penny of their debts to Bob and Columbine totaling over $3,000,000.  The Heirs misused the bankruptcy process.

57.     The Heirs' conduct in this case confirms this Court's concerns about the residents and impression that this is a two party dispute where the Heirs unlawfully purporting to control the Debtor have used bankruptcy as a litigation tactic to avoid returning COVID relief funds to recapitalize the Debtor and NSM, which small sum of money was not only affordable to the Heirs, but also would have avoided all of the injuries to the residents reported in the Ombudsman reports.

## **ARGUMENT**

A.     <u>11 U.S.C. Section 1112(b)(1)</u>

Section 1112(b)(1) of the Bankruptcy Code provides:

> on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7, or dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

Dismissal or conversion is a two-step process. First, a court must determine if cause exists. If so, then the court must determine what is in the best interest of creditors: dismissal or conversion. *In re Roberts*, 644 B.R. 220, 226 (Bankr. D. Colo. 2022) (citing *In re Peak Serum, Inc.*, 623 B.R. 609, 619 (Bankr. D. Colo. 2020) (citing *In re OptInRealBig.com, LLC*, 345 B.R. 277, 282 (Bankr. D. Colo. 2006)).

## I.     **Cause Standard**

15

Section 1112(b)(4) lists non-exclusive factors that may constitute cause under 11 U.S.C. § 1112(b)(1), and they include, in part:

(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

(B) gross mismanagement of the estate;
. . . .

(D)  Unauthorized use of cash collateral substantially harmful to 1 or more creditors;

(E) failure to comply with an order of the court;

(F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;

(G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the Debtor;

(H) failure timely to provide information or attend meetings reasonable requested by the United States trustee (or the bankruptcy administrator, if any);
. . . .

(J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;
. . . .

(M) inability to effectuate substantial consummation of a confirmed plan;

(N) material default by the debtor with respect to a confirmed plan;

(O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan. . . .

Judge Romero in *In re Gunnison*, 320 B.R. 391 describes a number of factors to support a finding of bad faith. Those factors are present here. To the extent the Debtor seeks to cure, as Judge Romero stated "it appears that the Debtor's efforts at this time are simply a case of 'too little, too late'." *Id* at 404.

"The factors listed in § 1112(b)(4) are illustrative of common circumstances that arise in the context of chapter 11 cases that can indicate the presence of cause for dismissal.

DE 8729065.1

However, the list is non-exclusive; Congress did not undertake to supply an exhaustive list of reasons to dismiss or convert a chapter 11 case." *In re Platte River Bottom*, 2016 WL 241464, at *3 (Bankr. D. Colo. 2016).[1]  "Courts always evaluate the totality of the circumstances to determine if cause exists to dismiss or convert a chapter 11 case under § 1112(b)." *Id.* at *4.  For instance, in *Platte River Bottom*, the Court found that the debtor "has abused the bankruptcy process by filing [] related bankruptcy cases to hinder and delay his secured creditors from enforcing their rights with no reasonable prospect of proposing a confirmable plan of reorganization. There is no 'effective reorganization *that is in prospect*.'" Id. (citation omitted; emphasis in original).

Courts also focus upon factors such as whether a valid purpose of Chapter 11 no longer exists or can be better achieved outside the Chapter 11 context:

> For example, because of postpetition actions there may no longer be any business to reorganize, or there may be a lack of assets to administer, in [C]hapter 11; there may have been a material change in circumstances postpetition such that confirmation of a [C]hapter 11 plan is no longer possible; the legitimate purpose intended by the debtor's [C]hapter 11 bankruptcy filing may have been achieved through settlement of litigation; or all interested parties may agree that continuation of the [C]hapter 11 case is not in their respective best interests.

*In re Peak Serum, Inc.*, 623 B.R. 609, 619 (Bankr. D. Colo. 2020) (quoting *In re Brewery Park Assocs.,* 2011 WL 1980289, at *16 (Bankr. E.D. Pa. 2011)).

Highly relevant here:  The Heirs could have avoided bankruptcy be simply complying with Section 4.2 of the partnership agreement and returning $1,000,000 of Covid Relief Funds.

Bad faith filing is "cause." "Bad faith" is not an enumerated "cause" for conversion or dismissal, but "it is well established under the Bankruptcy Code . . . that a Chapter 11 petition must

---

[1] Citing *Hall v. Vance*, 887 F.2d 1041, 1044 (10th Cir. 1989); *In re Colon Martinez*, 472 B.R. 137, 144 (B.A.P. 1st Cir. 2012); *In re Landmark A. Hess Farm, LLC*, 448 B.R. 707, 711 (Bankr. D. Md. 2011); *In re Paterno*, 511 B.R. 62, 66 (Bankr. M.D.N.C. 2014); *In re Van Eck*, 425 B.R. 54, 59 (Bankr. D. Conn. 2010); *In re Orbit Petroleum*, *Inc.*, 395 B.R. 145, 147 (Bankr. D. N.M. 2008).

DE 8729065.1

be filed in good faith, and if not, dismissal of the case is an appropriate remedy." *In re Pac. Rim Investments, LLP*, 243 B.R. 768, 771 (D. Colo. 2000)(citing *Udall v. FDIC (In re Nursery Land Dev., Inc.)*, 91 F.3d 1414 (10th Cir. 1996)). Indeed, "courts have overwhelmingly held that proof of such an allegation may be 'cause' for dismissal." *In re Ladouceur*, 2017 WL 5054307, at *4 (Bankr. D. Colo. 2017)(citing *In re Efusion Svcs.*, 2014 WL 5293415, at *2 (Bankr. D. Colo. 2014)); see also *In re: Cardel Master Builder*, 2019 WL 12287600, at *6 (Bankr. D. Colo. 2019).

Courts find the following factors useful in determining whether or not a Chapter 11 case has been filed in bad faith: "(1) the debtor has only one asset; (2) the debtor has few unsecured creditors whose claims are relatively small compared to the claims of the secured creditors; (3) the debtor has no employees; (4) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt; (5) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action; (6) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights; (7) the debtor cannot meet current expenses . . . ; and (8) the debtor has little or no cash flow." *In re Springs Hosp.*, 2006 WL 2458679, at *3 (Bankr. D. Colo. 2006); *see also In re eFusion Servs.*, 2014 WL 5293415, at *2 (Bankr. D. Colo. 2014); *In re Nursery*, 91 F.3d at 1416 (same).

The first 6 factors are undisputedly present here. With respect to factors 7 and 8, the Debtor has some cash flow, but refuses to pay it to the sole creditor as a litigation tactic.

A valid purpose for reorganization is necessary in order to conclude that the debtor's petition was affirmatively filed in good faith. *In re Ladouceur*, 2017 WL 5054307, at *5 (Bankr. D. Colo. 2017) (citing *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 129 (3d Cir. 2004)).

DE 8729065.1

Regarding a finding of bad faith, no single factor is dispositive, but when the petitioner's pre- and post-petition behavior is viewed in the totality of the circumstances, courts find bad faith where the petitioner's "aims are antithetical to the basic purposes of bankruptcy." *In re Springs Hosp.*, 2006 WL 2458679, at *3.

The movant bears the burden of establishing cause by a preponderance of the evidence. Once cause is demonstrated, the burden shifts to the opposing party to prove "unusual circumstances" establishing that converting or dismissing the case is not in the best interest of creditors and the estate. 11 U.S.C. § 1112(b)(2); *In re Whetten*, 473 B.R. 380, 382 (Bankr. D. Colo. 2012).

## II. <u>Best Interests Standard</u>

Upon finding cause, the Court has no reason to consider the Debtors' best interest arguments and should ignore them entirely on that matter. Section 1112 "instructs the Court to weigh the best interests of the creditors and the estate, not the Debtor" so "the Court is not required to consider the Debtor's best interest." *In re Sullivan*, 626 B.R. 326, 335 (Bankr. D. Colo. 2021). "What happens to the debtors is not really relevant." *In re Helmers*, 361 B.R. 190, 197 (Bankr. D. Kan. 2007).

Finding cause silences the Debtor and, after that, "creditors are the best judge of their own best interests." *In re Camden Ordnance Mfg.*, 245 B.R. 794, 802 (E.D. Pa. 2000). Tellingly, Wapello is the only creditor in this case. At one point the Larimer County Treasurer was a creditor, but it has been paid by misuse of Wapello's cash collateral.

"There is no 'bright-line test to determine [whether] conversion or dismissal is in the best interests of creditors and the estate.'" *In re DB Capital Holdings*, 2011 WL 5520439, *3 (Bankr. D. Colo. 2011)(citation omitted).

DE 8729065.1

> Once the threshold is passed and cause is found to exist, the decision whether to convert to Chapter 7 or to dismiss is committed to the discretion of the bankruptcy court. The standard for choosing conversion or dismissal based on "the best interest of creditors and the estate" implies a balancing test to be applied through case-by-case analysis. The element of the best interest of creditors requires the Court to consider which alternative would be most advantageous to the parties. The element of the best interest of the estate focuses upon whether the economic value of the estate is greater inside or outside of bankruptcy.

*In re Gateway Ethanol*, 2011 WL 597059, *2 (Bankr. D. Kan. 2011).

The Court's October 3, 2024 ruling remains true today – dismissal is better for the residents than conversion. Bob and Wapello concur with this Court's instincts that dismissal is better than conversion.

## III.    <u>Analysis</u>

Here the Court can take judicial notice of the record which demonstrates that cause exists to convert this case.

First, this case is a two-party dispute in a single asset real estate case as defined in 11 U.S.C. 101(51B). This dispute does not belong in bankruptcy court.

Second, this case was not filed in good faith for the reasons this Court stated on the record in a July 21, 2023 hearing in this case and on the record in an October 3, 2023 hearing in the companion North Shore Manor ("NSM") case which the court dismissed.

Third, this case is an ultra virus filing made under a Resolution (Doc. 27) stating that the Debtor "duly held according to law" a partnership meeting. Bob did not have notice of any partnership meeting and was excluded from a secret meeting of some partners after Bob stated that it was in the best interest of the partnership and residents to complete a $1,000,000 recapitalization instead of filing bankruptcy.

Fourth, this case is unnecessary because Section 4.2 of the Debtor's partnership agreement provides for a capital call to pay the sole creditor in this case. The Heirs are sophisticated and

DE 8729065.1

wealthy heirs who inherited a real fortune and who chose a bankruptcy path instead of simply repaying Covid Relief funds funneled to them through NSM.

Fifth, the Heirs, hiding behind the Debtor, misused Bankruptcy as a litigation tactic to avoid repaying CoVid Relief funds needed for the welfare of the residents.

Sixth, the Debtor, operating under the direction of the Heirs, proposed an unconfirmable plan seeking "exculpation" of themselves and their professionals.

Seventh, during the course of the above, the Heirs controlling the Debtor dodged service of subpoenas in this case in a manner which this Court described "I, frankly, really have not seen that level of evasion of service before in my nearly eight years on the Bench, and nearly 41 years of practice." Those "other partners" still have not been deposed.

Eighth, the Debtor failed to timely file operating reports and to pay U.S. Trustee fees as described in the UST's motion.

Ninth, the Debtor's plan and disclosure statement omitted any discussion of Cover Relief Funds the Debtor distributed to the insider Heirs.

Tenth, the purported managing partner (David Fogel) and the Heirs dodged subpoena to avoid their examinations.

Eleventh, there has been mismanagement.

Twelfth, Linda Fogel and the Heirs exhibit no concern for the residents and express only concern about interruption in their distributions.

This case was not a good faith filing and should be dismissed. *In re Gunnison Center Apartments, LP*, 320 B.R. 391 (Bankr. D. Colo. 2005).

## IV.  **The Dismissal Should Be Structured To Restore Wapello's Right To Its Cash Collateral**

DE 8729065.1

According to the Debtor's untimely filed operating reports, after misuse of cash collateral the Debtor holds $547,363.65 of collected rents constituting Wapello's cash collateral.

The dismissal order should be structured to protect Wapello's cash collateral in the Debtor's possession reported to be $547,363.65 in the March 2024 operating report.

The Heirs controlling this ultra virus filing also controlled the NSM case. NSM's attorneys who performed work which the court questioned was compensable negotiated for Bob to buy out the "other partners". NSM's accountants also had a $110,000 fee application held in abeyance because they missed a filing deadline with the Department of Health and Human Services resulting in a $334,000 claim against the estate.

In lieu of fee application scrutiny, the Heirs dismissed the NSM case, paid their professionals, and never paid a penny towards the $3,000,000 that NSM owes to Bob and Columbine.

No doubt, this Debtor will do the same. Any dismissal order should require the Debtor to turn over to Wapello all of Wapello's cash collateral upon dismissal. 11 U.S.C. 349; *Czyzewski v Jevic Holding Corp.*, 137 S. Ct. 973 (2017).

## V.    <u>DISMISSAL AND NOT CONVERSION IS IN THE BEST INTEREST OF CREDITORS</u>.

Dismissal and not conversion is in the best interest of the residents and the creditors for the reasons the Court outlined in the October 3, 2023 hearing which led to the dismissal of the NSM case. This case should be dismissed and not converted. Wapello is the only creditor and is entitled to deference. <u>In re Sullivan</u>, 626 B.R. 326 (Bankr. D. Colo. 2021).

The Court, Wapello and Bob have been patient with the Debtor. The debacle show now comes to an end.

DE 8729065.1

DATED May 20, 2024.

Respectfully submitted,

SPENCER FANE LLP


*/s/John O'Brien*

John O'Brien  #15183
Scott C. Sandberg #33566
Zachary Fairlie #68057
Spencer Fane LLP
1700 Lincoln Street, Suite 2000
Denver, Colorado 80203
Phone: (303) 839-3800
Fax: (303) 839-3838
Email:  jobrien@spencerfane.com;
ssandberg@spencerfane.com;
zfairlie@spencerfane.com

Attorneys for Wapello Holdings II, LLC and J.
Robert Wilson

DE 8729065.1

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on May 20, 2024 I served via CM/ECF system an electronic copy of the foregoing on all parties against whom relief is sought and those otherwise entitled to service pursuant to the Fed. R. Bankr. P. and the L.B.R. at the following addresses:

Keri L. Riley <u>klr@kutnerlaw.com</u>
US Trustee <u>USTPRegion19.DV.ECF@usdoj.gov</u>
Robert Samuel Boughner <u>Samuel.boughner@usdoj.gov</u>

*/s/John O'Brien*
John O'Brien

DE 8729065.1